## No. 11,390.

### SUCCESSION OF ELIZABETH BEY.

1. When a will is established to have been made by the testator himself, or by a notary at his instance and dictation, in the presence and hearing of the subscribing witnesses, unaided by others, and its provisions and expressions are sage and judicious, containing nothing sounding to folly, these facts establish a presumption, even in the case of a person habitually insane, that it was made during the existence of a lucid interval, and impose on those who attack the will the burden of proving insanity at the moment when it was made.

2. Death of the testatrix by suicide does not raise a presumption of insanity at date the will was executed. Even when the suicidal act is unquestionably the effect of insanity, it does not necessarily follow that a will prepared within a short time previous is invalid.

APPEAL from the Civil District Court for the Parish of Orleans. *Rightor, J.*

*Farrar, Jonas & Kruttschnitt* Attorneys for Legal Heirs and Administrator, Appellees:

"Where general insanity, even with some intervals, is shown, the burden of showing that the particular act in dispute was made during such an interval is thrown on the party who supports the validity of the act or contract." C. C., Art. 1788, Sec. 9.

" A lucid interval under the civil law is not an apparent tranquillity or a seeming repose. It is not a simple diminution or a remission of the disease, but a temporary cure." Aubert vs. Aubert, 6 An. 108.

The law recognizes two classes of insane persons—one called *furiosos*, the other *mente captos;* the latter class do not enjoy lucid intervals. Aubert vs. Aubert, 6 An. 109.

Melancholia is classed as *mente captos.*

Only in cases of *furiosos*, or where acts of insanity are rare and intermittent, will apparent wisdom of the testament necessitate proof that decedent was sane at moments of its confection. Chandler vs. Barrett, 21 An. 58.

The decision in Kingsbury vs. Whitaker, 32 An. 1057, must be read in the light of the facts therein involved, which explain the expressions therein and give a different effect thereto than when read by itself.

*Frank Zengel* Attorney for Absent Heirs, Appellees:

A person who is affected with monomania, although sensible and prudent on subjects and occasions other than those upon which his infirmity is commonly displayed, is not, in law, capable of making a will. Wharton and Stille, 45.

When delusions exist which have no foundation in reality, and spring only from a diseased and morbid condition of the mind; to that extent the mind must necessarily be taken to be unsound.

Melancholia is settled and continuous depression of the mental faculties.

C. C., Art. 1474: To make a donation either *inter vivos* or *mortis causa*, one must be of sound mind.

C. C. 400: The interdiction takes place from the day of presenting the petition for the same.

C. C. 401: All acts done by the person interdicted, from the date of the filing of the petition for interdiction until the day when the same is pronounced, are null.

If by facts occurring near the time of the date of the testament and preceding and following it, the heirs have proved an habitual state of insanity, then and notwithstanding the wisdom of the will the onus would be shifted on to the legatee to prove the sanity of the testator during the intermediate time—that is, at the date of the testament. Chandler vs. Barrett, 21 An. 58.

It is incumbent on the party alleging mental unsoundness to show it. If general unsoundness is shown before the making of the will, the burden of proof is then on the proponents to show that the incapacity had ceased at the time of execution. 47 American Decisions, 422.

Where a person's acts for a series of years are different from those governing mankind at large, and differing widely from his former conduct and character; where the change in his intellectual capacity from that of an educated, careful and attentive business man, is to one who is allowed but a trifle of money such as would please a child; whose property and person are entirely in the control of others, brutally exercised and uncomplainingly submitted to; who requires the daily care of his wife to shave him; who at length becomes the inmate of an insane asylum, and thenceforward lives and dies a lunatic. Held, that all these circumstances indicate a clear case of insanity and will invalidate a deed executed under such circumstances. Haviland vs. Hayes, 37 N. Y. 25.

To render a person competent to dispose of his property by will, it is not enough that he be possessed of some degree of intelligence and mind, but he must have sufficient mind to comprehend the nature and effect of the act he is performing, and the relation he holds to the various individuals who may naturally be expected to become objects of his bounty. Wait's Digest of New York Reports, 739.

Where there is conflicting evidence on the question of the mental soundness of the testator, medical testimony has the greatest weight.    4 Wait's Digest, New York, 761.

The expert testimony of medical men is the most important of all, for it requires the most minute, varied and extended knowledge; it frequently relates to subjects of an intricate and recondite character; it is applied to the settlement of questions affecting the three great interests which men most love—namely, life, reputation and property.

The opinion of witnesses, who are not physicians or experts in matters of insanity, touching the condition of the mind of a human being, are entitled to little or no weight as evidence in a trial involving the alleged insanity of a person.    Great weight and legal effect will be given to the opinions of physicians and experts.    Eloi vs. Eloi, 36 An. 563.

Wills may be avoided, though there has been no interdiction nor notorious insanity and more than thirty days have elapsed between their date and the testator's death; not so with contracts, which are less easily avoided for unsoundness of mind. Testaments are more easily avoided on the ground of unsoundness of mind than contracts.    Aubert vs. Aubert, 6 An. 104.

A mortgage made by a notoriously insane person, and who was at the time known by the mortgagee to be imbecile, is null and void, although the mortgagor was not interdicted at the date of the mortgage.    Pecel vs. Guinault, 32 An. 94.

Chronic insanity is presumed to continue.    State vs. Briyea, 5 Ala. 244; 11 Am. and Eng. Ency. of Law, No. 11, 160.

The burden of proof is upon the one alleging a lucid interval where by common report the vendor was supposed to be insane. Rogers vs. Walker, 6 Pa. Stat. 371.

It should be borne in mind, that when continuous insanity is proved, the burden of proving a lucid interval, during which the instrument is alleged to have been executed, is on the party setting up the instrument.

It is otherwise, however, when the prior insanity alleged was spasmodic and parenthetical, or consisted of delirium tremens.    18 Ill. 282; Menkins vs. Lightner; Ackey vs. Stephens, 8 Ind. 411; State vs. Wellington, 58 Maine, 658.

*Dinkelspiel & Hart,* Attorneys for Henry Schipman, Testamentary Executor and Appellant:

Sanity or soundness of mind being the natural condition of mind, insanity is never presumed, but must be affirmatively and contradictorily established.   32 An. 1058.

The presumption is always in favor of the act; insanity is never presumed.   Chandler vs. Barrett, 21 An. 60.

If a testament presents a series of wise and judicious dispositions, the onus is upon the heirs who attack it to prove unsoundness of mind at the date of its execution.   21 An. 60.

When the will was made by the testator himself, unaided by others, and its provisions and expressions are sage and judicious, containing nothing sounding to folly, "it will be assumed, even in case of a person habitually insane, that it was made in a lucid interval; and the burden of proof will be upon those who attack it to show insanity at the moment when it was made.   Kingsbury vs. Whitaker, 32 An. 1057.

The test of the law upon this subject is whether, at the moment of making the will, the testator was of sufficiently sound mind to fully understand the nature of the testamentary act and appreciate its effects.   Kingsbury vs. Whitaker, 32 An. 1057.

Suicide committed by the testator soon after making his will is not conclusive evidence of his insanity.   7 Pickering, 94.

The law draws no inference against the sanity of a person from the mere fact of suicide.   Duffeld vs. Robeson, 2 Harring, 375.

The opinions of medical men are received upon questions of professional skill, but they should state the facts on which such exceptions are based, and the opinions themselves are not conclusive, but must be weighed as other evidence.   Chandler vs. Barrett, 21 An. 58.

———

The opinion of the court was delivered by

WATKINS, J.   The legal and presumptive heirs of the deceased resist the probate of her last will on the ground that she was insane at the time of its execution and incapable of making a legal and valid testament.

The introduction of evidence took a wide range, and at the trial there was judgment in favor of opponents, annulling the will, as

having been made by an insane person; and it decreed that, "by reason of her insanity," the testatrix died intestate.

The testamentary executor propounded the will for probate, and had an inventory taken, but the probate of the will was resisted by the attorney for absent heirs, who had, theretofore, been appointed at the suggestion of the public administrator, who had undertaken the administration of the succession as a vacant estate.

The theory of opponents seems to be that the testatrix was afflicted with that species of insanity known in medical jurisprudence as *melancholia*, the effect of which was to render her incapable of transacting the business affairs of every-day life, and consequently of making a testamentary disposition; and the fact of her having committed suicide shortly subsequent to the execution of the will is referred to and relied upon by opponents as confirmatory proof of her previous insanity. And it is asserted in the brief, as well as in the oral argument of appellant's counsel—without denial from the other side—that the judge below assigned the fact of her suicide as being a weighty if not a conclusive proof of her previous want of capacity to make a will.

Counsel for the appellees make reference to the proceedings which were inaugurated for the interdiction of the deceased shortly previous to the making of her will as a circumstance corroborating her state of confirmed insanity at that time.

To these three facts—or incidents, rather, in the life of the unfortunate young woman—all of the testimony on either side seems to have been directed, other evidence being merely corroborative.

Arranging these three events in the order of their occurrence, we find from the record that the interdiction suit was filed on the 16th of August, 1892, the will was executed on the 18th of November, 1892, and the suicide occurred on or about the 3d of January, 1893.

As it is evident that the test of the sanity of the testatrix at the time of making her will is of the greatest importance—in fact, is the crucial question in the case—the *terms* of the will and the circumstances surrounding its execution must be examined at the outstart, this court having decided that the test of the law is whether, at the moment of making a will, the testator was of sufficiently sound mind to fully understand the nature of the testamentary act, and appreciate its effects. Kingsbury vs. Whitaker, 32 An. 1055.

*(a)* An examination of the will discloses that it was executed in the presence of F. D. Charbonnet, a notary public, and four witnesses, two of whom were practising lawyers.

It appears from the testimony that on the 18th of November, 1892, during the business hours of the day, the deceased appeared at the notary's office pursuant to a previous agreement to that effect, and that at the time and place agreed upon said notary received her last will and testament, in the presence and hearing of four witnesses, as dictated to him by said testatrix.

A fair synopsis of the testament is as follows, viz.: That the testatrix bequeathed to one of the legatees an improved city lot; to another, a sum of money that was to her credit in a designated homestead association, and a lot of household furniture, etc.; to another, certain shares of stock in the Merchants' Mutual Insurance Company; to another, certain other shares of stock in the same company; to another, certain other shares of stock in the same company; to another, certain other shares of stock in the same company; to another, the family tomb in the Vincent de Paul Cemetery; and to another, the vault in the Odd Fellows' Rest.

It was concluded by appointing an executor without bond, denominating him "her good friend."

The circumstances under which the testament was executed are detailed by the notary and subscribing witnesses.

The notary states that the will was made at his office, during the business hours of the day, and in the immediate presence and hearing of the four witnesses who subscribed their names to the act.

That same was executed by him in pursuance of a previous agreement with the testatrix.

That previous to the execution of the will the deceased had called at his residence to see him, and learning of his absence she left with his wife a message for him to the effect that she desired to see him about making a will. That, accordingly, he visited her, and they had a conversation upon the subject and agreed upon the price.

"She wanted," so the witness states, "the will to be made at her house. I told her what I would charge. She hesitated, and jewed me down.   *   *   *   She asked me if I could not do it any cheaper, (naming) a price; and I told her if she wanted it at that price to come to my office, and she came a day or two afterward."

This witness further states that when the deceased came to his

office she stated that it was for the purpose of making her will, and the will "was dictated to (him) by Miss Bey's own lips;" that "she appeared to be in a condition such as any ordinary person would that would come to make a will." That when completed the will was read to her in the presence and hearing of the witnesses, and she seemed to properly understand its provisions and signed it in his presence and in that of the subscribing witnesses. That, after its completion, she handed him the exact amount of the fee agreed on between them some days previously, without any discussion, or suggestion from any one.

During the course of the notary's examination, the following occurred with relation to his visit to the residence of the testatrix, viz.:

"Q. But you afterward went to her house?"

"A. Yes."

"Q. Did she seem to thoroughly understand the object of your visit?"

"A. I asked her if she sent for me, and she said 'yes.'"

"Q. Did she tell you that she wanted a will made?"

"A. Yes."

And with reference to her visit to his office he said:

"Q. If there had been the slightest doubt in your mind as to her sanity would you have made the will?"

"A. No, sir; I would not."

"Q. You have known this lady, how long?"

"A. I have known her a long time. I lived in the neighborhood for some time."

In speaking of the deceased as she appeared on the occasion of his visit to her, and on that of her visit to his office, he says she was well dressed and made a nice appearance.

Again he says, in speaking of what transpired at the time the will was executed, the following occurred, viz:

"Q. Did she have any hesitation in declaring her intentions to make a will before you?"

"A. None at all."

"Did any one help her or aid her in making the disposition?"

"A. No; I would not have written what I did if anybody had."

\*      \*      \*      \*      \*      \*      \*

"Did Miss Bey have any paper or memorandum from which she read when dictating the will?"

" A. I never saw any."

\*·        \*        \*        \*        \*        \*        \*

" Q. When you read (the will) aloud to her and to the witnesses, did she have any paper before her to (enable her) to follow the reading? "

" A. I never noticed any."

The testimony of this witness is entirely supported and confirmed throughout by that of the four subscribing witnesses—they being interrogated and cross-interrogated at length.

The testament, dictated as it was by the testatrix, bears internal evidences of judgment, forethought and careful preparation, as well as accurate knowledge of her property, and the means she possessed at the time of its confection, as well as perfect acquaintance and familiarity with the different persons who are mentioned as legatees. Not only so, but it evidences a sentiment of affectionate interest in, and concern for, the persons she considered her special friends; and she seems to have apportioned her bounty relatively to their nearness to her. And in the dispositions of her will, taken as a whole, she seems to have exercised reasonable care for the mutual interests of all, without making any unreasonable or unusual bequests to any.

The only thing preferred against it is that the testatrix instituted *friends* instead of *collateral* relations as her heirs. But, in the light of the law, she had a recognized right to thus dispose of her property; and her collateral relations resided abroad and were unknown to her—no intimacy, or even acquaintance, seeming to have ever existed between them during her lifetime.

Certainly, this testament possesses no internal evidence of the insanity of the testatrix at the date of its execution; and the circumstances detailed by the notary and subscribing witnesses negative that idea.

With regard to the interdiction proceedings that were instituted in August previous to the making of the will in November, nothing need be said, beyond the fact that they were but the culmination of a sentiment that prevailed in the community in which she lived during some months previous, to the effect that she was insane; and the further fact that they were discontinued, voluntarily, ten days before the will was made by the parties who inaugurated them— without the assignment of any reason or excuse.

Of themselves they can not furnish any evidence of insanity, as they did not result in a judgment of interdiction.

The person in whose name the interdiction suit was brought states that he had known the deceased for a long time, and that during her father's lifetime she was " a very sensible, fine young lady."

He says " she was of good, sound mind before (he) saw her at Mrs. Roper's."

His statement is that her father died in February or March, 1891, and soon afterward she removed to the house of Dr. Keitz, on an invitation of the latter, carrying all of her furniture, clothing and effects.

Another witness states that the deceased was removed from the residence of Dr. Keitz to her own on the 2nd of June, 1892—more than two months previous to the institution of the interdiction suit; and inasmuch as most of the evidence appertaining to her insanity relates to the period of time she resided in Dr. Keitz' house, it is well to look into the circumstances of her arrival at and her departure from his house—a period of something more than one year.

The witness last referred to states that she had known the deceased about seven years previous to her death, and very intimately. That the deceased and her father lived in a tenement adjoining the one which witness and her husband occupied—there being only a partition wall between them. That during the seven years of their acquaintance, the greatest intimacy existed between the two families. That she was present when the testatrix' father died, and she describes the death scene and surroundings graphically. That the deceased remained alone in her father's house about three weeks, when she moved to the house of Dr. Keitz to live. That, in speaking with witness on the subject, she said: " Well, Dr. Keitz says for me to break up housekeeping and go to his house, and I will fall into grand society." That witness replied: " All right, Lizzie. Just as you wish." That the deceased responded: "Well, I am going to try it; it may be better and it may be worse."

Up to this date there is no suggestion of her insanity—the first intimation of it coming from Dr. Keitz in May, after her instalment in his house in March—though it remained *undisclosed until the rumor* had become flagrant in the neighborhood.

About six months later she stated to Mrs. Roper that she wished she had broken her neck before she went to Dr. Keitz' house—

making many serious complaints, and, amongst others, that she had been drugged by the doctor, and affirming "that she had not felt well since Dr. Keitz drugged her with those pellets."

This lady, Mrs. Roper, states that the first she heard of Miss Bey's alleged insanity was through Mrs. Heitzman, in the spring of 1892. That, about that time, Miss Lizzie Bey sent for her to come to see her, and she went; but that she first met Dr. Keitz, who stated that Miss Bey was "going from bad to worse—was losing her mind." That on afterward meeting Miss Bey, she exclaimed: "Oh, Mrs. Roper, Mrs. Roper—I should have broken my neck the day I first put my foot in this house. * * * I have been taking those pellets; I have been taking too much of those morphine pellets."

Soon after this occurrence, the rumor of Miss Bey's insanity was publicly discussed in the vicinity of Dr. Keitz' residence, and it created quite a sensation among the people of her acquaintance. Many persons visited Dr. Keitz' house, for the purpose of seeing the insane girl—without protest or objection on the part of any member of Dr. Keitz' family. On the contrary, these visits were apparently encouraged by them.

A day or two after the occurrence above related, Dr. Keitz called Dr. Castellanos to see Miss Bey professionally, and he held a short interview with her—in the *presence of a number of persons* who seemed to have been attracted there through curiosity—and afterward gave it as his opinion that she was suffering from *melancholia.*

The day following this interview, Mrs. Roper carried Miss Bey to her house to live—said removal being made at the instance of Dr. Keitz' wife.

On the occasion of Miss Bey's removal from the house of Dr. Keitz, he stated to Mrs. Roper that "*if anything happens* to her," that she must let him know—qualifying the observation by the remark that she might die, or that she might have to be strapped down.

All of this occurred in Miss Bey's presence.

Dr. Keitz, as a witness, states that he had been the family physician of Miss Bey's father, and had known her familiarly for several years prior to her coming to his house to live, but that the first symptoms of insanity developed themselves in May, 1891—two months after her coming into his house to live. He speaks of hav-

ing only seen her once after she was removed to Mrs. Roper's, and that was in October, 1892. In speaking of her capacity to make a will he says: "The disease may have abated, but I do not think she was ever after of sound mind."

Notwithstanding the fact that Miss Bey was removed from his house on the 2d of June, 1892, and he had not seen her afterward until October, Dr. Keitz admits that he had *first suggested her interdiction, and that the suit was filed at his request in August.*

Though Dr. Seeman had seen Miss Bey professionally after her removal to Mrs. Roper's, and testified at the commencement of the trial of the interdiction suit that she "had been subject to *fits* of melancholia" for six months previous, yet it is a fact that the interdiction suit was discontinued at his suggestion, mainly, ten days prior to the making of the will and subsequent to the delivery of his testimony therein.

But it does not appear that Dr. Seeman ever made a careful examination of Miss Bey with a view to making a test of her sanity, and hence the conclusion is that his opinion was based upon casual observation.

Dr. Szabary was called and interrogated *by opponents as a medical expert on matters of insanity*, and he testifies that he visited Miss Bey professionally during the time she was at Mrs. Roper's house, and he states that her disease was "*nervous prostration.*"

He states that he visited her twice, and "found no other sickness except emaciation and prostration."

These two visits were made on June 4 and 8, 1892, respectively—that is, immediately after her removal to the residence of Mrs. Roper on the 2d of June.

The doctor states that he questioned her critically as to her condition, and that she answered him simply and satisfactorily—giving no evidences of insanity.

The following interrogations and answers will best discover the true situation, viz.:

"Q. During that entire conversation was there anything which she said that would lead you as a medical man of standing and reputation to think that she was out of her mind?"

"A. No, sir."

"Q. Then, on the other hand, speaking affirmatively as a med-

ical man, was there or was there not sufficient evidence that she was an intelligent person?"

" A. Yes."

" Q. A person of good common sense? "

"A. Yes."

" Q. She spoke to you lucidly and plainly? "

" A. She answered all my questions."

"Q. And answered them sensibly? "

" A. Yes."

\*       \*       \*       \*       \*       \*       \*

" Q. Did she have the appearance that would indicate, in the slightest degree, that her mind was disordered or disarranged? "

" A. None whatever."

\*       \*       \*       \*       \*       \*       \*

" Q. Are you prepared to say, doctor, that you made an examination of her mental condition and that you are prepared to testify as to its condition at that time?"

" A. Yes."

" Q. As an expert? "

" A. Yes; as the physician in charge of the Insane Asylum, years ago, I can tell you something about it."

\*       \*       \*       \*       \*       \*       \*

" Q. If there had been, in your judgment, the slightest indication tending toward insanity in this woman, would you or not have noticed it? "

" A. I would."

" Q. Would it not have come directly under the investigation you were then making? "

" A. Yes."

" Q. Did you notice anything of the kind? "

"A. There was nothing to be noticed tending to show that she was insane."

" Q. From her looks, demeanor and general conduct, was she or not, in your opinion as an expert, capable of attending to her business and attending to the ordinary affairs of life? "

" A. She was."

It is a noteworthy fact that this doctor was first called to see Miss Bey the day *after she had been removed to Mrs. Roper's,* and that Dr.

50

Castellanos was called to see her the day *previous* to her departure from Dr. Keitz' residence; and while their statements are diametrically opposed to each other in respect to the lady's mental condition, on those two occasions, we are of opinion that the difference is mainly attributable to the *radical change in her situation* and surroundings, occasioned by her removal from Dr. Keitz' to Mrs. Roper's house.

Under the circumstances detailed, we are disposed to attach greater importance to the testimony of Dr. Szabary than to that of either of the other medical experts—owing to his special fitness to testify in reference to insanity, and to his having made a more careful examination of the testatrix, and under more favorable conditions.

Outside of the isolated expressions of opinion by Dr. Seeman —we do not include that of Dr. Keitz—none of the opponents' leading witnesses testified to facts or circumstances which occurred *subsequent* to Dr. Szabary's examination of Miss Bey; though all of the executor's witnesses devote almost exclusive attention to such subsequent facts and circumstances. These witnesses state that they had known the deceased for ten or twenty years, and they concur in the opinion that she was not insane, while admitting that she did evince some idiosyncrasies while she resided at Dr. Keitz' house. All of them join in the statement that she was generally right-minded and sensible while she lived with Mrs. Roper, and was at all times capable of attending to her own affairs; and it is in proof that she did attend to the payment of her taxes, the collection of her rents and the management of her investments. And it is also in proof that on the day the interdiction suit was fixed for trial she was present at the wedding ceremony of Mrs. Roper's son, and participated in the wedding feast. Even Dr. Keitz admitted that Miss Bey had given him promissory notes in liquidation of her board while at his house.

A careful examination of the evidence, embracing the dates above given, has satisfied us that Miss Bey was at the moment of making her will, of sufficiently sound mind to fully understand the nature of the testamentary act and appreciate its effect; whether the will was made during the existence of a lucid interval, or by a person of absolutely sane mind, it is comparatively unimportant to inquire.

The theory of the medical experts favoring the insanity of the testatrix is that she was afflicted with *melancholia*, which is in its nature incurable, and not susceptible of lucid intervals.

Such is the opinion of authors on medical jurisprudence, and it was likewise a precept of Justinian, which has been recognized in the jurisprudence of this court.    Aubert vs. Aubert, 6 An. 104.

But, it is our opinion—accepting this theory—that the evidence does not make a case against the testatrix of *melancholia;* but, conceding for the argument, that the evidence *tends* in that direction, the clear and indisputable proof of the will having been made at a time when the testatrix was perfectly rational and apparently sane, contradicts it, and renders it an unacceptable theory, or proves her sanity altogether.

Our code recognizes the validity of a will made by an insane person during the existence of a lucid interval.    R. C. C. 1788, No. 9.

The rule in reference to the power and strength of mind necessary to make a will is well stated in Chandler vs. Chandler, 21 An. 58, thus: " So far as the latter is concerned "—the amount of intellect required in a testator—" a will may well be made by any mind which has the soundness and strength necessary to endure the conflict involved in the making of a bargain.    It would be unreasonable to require that a testator should have more mental vigor and a more lucid memory than a person who makes a contract."

The court states the French jurisprudence to be the same as our own, or rather, that our jurisprudence has followed the treatises of the French commentators—the rule being that if the testament present a series of wise and judicious dispositions, it is for the heirs who attack it to prove the unsoundness of mind at the date of the testament; if, on the contrary, it contains dispositions such as would cause insanity to be presumed, it is for the legatee to prove the sanity of the testator, as against the terms of the testament.    Coin Delisle, Don. and Test., p. 82.

The legal presumption is always in favor of the sanity of the testator.    Droit Civil, Vol. 3, p. 44; Marcadé, Vol. 3, p. 403; Duranton, Vol. 8, p. 167.

The presumption of sanity does not cease because the testator has experienced some transitory intellectual derangement at a time anterior to the testament.    Troplong, Don. and Test., Vol. 2, p. 56.

The English jurisprudence is the same.    Chambers vs. The Queen's Proctor, 2 Curtiss, 415; Ray's Medical Jurisprudence, 272; 1 Jarneau on Wills, p. 72; Fullick vs. Allison, 3 Hazzard, 527; Halley vs. Web-

ster, 21 Maine, 461; Clark vs. Fisher, 1 Paige, 174; Johnson vs. Van Dusen, 5 Johnson, 144.

In the instant case the circumstances that are recited and relied upon as indicating the mental unsoundness of the testatrix are not nearly so strong or so convincing as are those recited in the Chandler case; while those surrounding the testatrix at the time of making the will are very much the same.

The opinion in the Chandler case is thus concluded: "If the acts of insanity are rare, and occur at periods distant from each other, and from the date of the testament, the testament if not destitute of good sense, and betraying no folly on its face, will sustain itself (and) be presumed to have been the offspring of a healthy volition and a lucid memory."

The will under consideration fulfils all of those requisites completely. The proven acts of folly occurred some months previous to the execution of the will. The will is sensible throughout, and was by the testatrix dictated to the notary, without any memorandum or suggestion from any one, and betrays no folly on its face.

The extrinsic evidence of the insanity of Bowditch, on which the court decided the case of Kingsbury vs. Whitaker, 32 An. 1057, was, in our opinion, much stronger than it is in this case against Miss Bey, and yet the judgment annulling the will of Bowditch was reversed, notwithstanding three of the most distinguished physicians of the city of New Orleans testified that the testator was insane, and the Boston physician testified in the same tenor, and Bowditch had been regularly interdicted by a judgment of court and he was incarcerated in the asylum.

The court said:

"When physicians tell us that Bowditch must have been insane on the 24th of June, 1876 (the date on which the will was executed), we turn to the will, written entirely by himself as shown by the testimony of two witnesses of unimpeached character and veracity who saw and conversed with him on that day and at that moment, to whom he spoke very rationally of his will, we must conclude that the physicians were mistaken," etc.

The will of Miss Bey contains more convincing proof of her sanity, and the notary and four subscribing witnesses testify, most circumstantially, to its dictation by her in a manner clearly indicative of her sanity.

In the Kingsbury case the rule of interpretation, as formulated from the consensus of opinion on the subject, is thus stated:

"The real question is, whether the brain, or other physical organ, whatever it may be, which is the medium through which the action of the mind is manifested, is so diseased or impaired as to make it an untrustworthy vehicle for the conveyance of the true wish, or will of the testator, unbiased by any delusion which may be the result of disease. The law fixes the time for the application of this test, at the moment when the will is made, and expressly recognizes the capacity of persons, subject at times even to complete *dementia*, to make a will in lucid intervals. When the will is established to have been made by the testator himself, *unaided by others*, and when its provisions and expressions are sage and judicious, 'containing nothing sounding to folly,' these facts establish a presumption, *even in the case of a person habitually insane*, that it was made during the existence of a lucid interval, and imposes on those who attack the will the burden of proving insanity at the moment when it was made."

This rule is more accurately stated than the one formulated in the Chandler case, and we prefer to follow it; but the will of Miss Bey sustains all the requirements of this rule, as well as of the former—for, in our view, her will is good and valid, whether it is interpreted by *intrinsic* or *extrinsic* evidence.

But, if we go further and look into the evidence surrounding the suicide of the testatrix, it is impossible to conclude that—even if she were confessedly insane at the time—it evidenced her *previous* insanity at the time of making her will.

The following is the full text of the letter that was found on the person of the deceased after her death, viz.:

"NEW ORLEANS, Jan. 3, 1893.

"DEAR FRIENDS—I wish to inform you that I am tired of living so concluded to take my life. Dr. Keitz and Dr. Castellanos said that I was insane and going from bad to worst, and that I would not live longer than two or three days after they took me out of his house to Mrs. Roper's, they would have to strap me down; it is going on to eight months and have not been strapped yet, and am no more insane than he is.

"When dead I ask of Dr. Seeman, the coroner, to examine my brain and let the public know what he said about me. I am not

sick, and not well; I do not know what ails me; he must have drugged or got some one to harm me, for it is not natural what I have; I can not live any longer, for I am in misery and can not help myself. *I have my will made some months ago to my friends with the exception of ten shares of stock of the Mutual Ins. Co., to pay my funeral expenses, by my adopted brother Henry Schipman, who is my testator, if there is any left to keep it and give Margaret fifty dollars.* It is hard for me to take my own life, but I hope God and my friends will forgive me, for I could not live longer, there is not another person in this city that is like I am, the party who did that to me I hope will have no luck and follow me soon. When my body is found let Mrs. Roper be notified, and let Mr. Dupresses, the undertaker, bury me. *Mrs. Roper's address is 675 North Rampart street.*

"Yours truly,

"ELIZABETH BEY."

This letter evidences care and thought, and it corresponds throughout with the whole pitiful story that is detailed by other witnesses. It evinces an exact memory of former transactions, especially the occurrences of the 2d of June, 1892, when, in the presence of a number of persons, she was examined by Dr. Castellanos; and of the 3d of June, when she was removed to Mrs. Roper's house. Its reference to her will is quite significant, indeed, and the exactness of her recollection as to the reservation of certain shares of insurance stock for the purpose of defraying the expenses of her funeral is even more remarkable for its tenacity.

Instead of this letter, dated on January 3, 1893, proving her insanity, it furnishes additional evidence of the sanity of the deceased.

Dr. Ray makes the following observations on the question of the suicide of a testator, as affecting the validity of his will, on the theory that suicide raised a presumption of insanity:

"At present," says that author, "the fact of suicide has no other importance than what it derives from its connection with the mental derangement which must be supposed to have given rise to it. Courts would very justly refuse to consider it as *sufficient proof of insanity*, in the absence of other proofs, because it might have been the act of a rational mind, and because, too, if it really had sprung from insanity, the delusion had been so circumscribed as not to have

prevented the judgment in regard to testamentary dispositions and other civil acts.

" The principle adopted in the ecclesiastical courts is, that in cases of *doubtful sanity*—amongst which those of suicide must always be ranged—the validity of the individual's testament must be determined *solely by the character of the instrument itself.* (Our italics.)

" Here is a difficulty that courts will never be very anxious to encounter, and that is to determine *the exact connection of suicide with insanity*—in point of time—supposing the latter to be admitted. When this act is the *only* proof we have of mental derangement we are left without the means of ascertaining where this connection began to exist or to disappear; and, consequently nothing can be more difficult than to decide within what time, either before or after the suicidal attempt, the individual can be pronounced insane. *It not uncommonly happens that a person kills himself,* or *makes the attempt, shortly after making his will,* when the question requires judicial decision whether or not the insanity which led to the fatal act existed at the time of making the will. The practice has usually been, if there were no other evidence of unsound mind, either in his conduct, in his conversation, or in the testamentary dispositions themselves, not to impeach the testator's sanity.

" In a certain case, it was said by Sir John Nicholl that when there was no evidence of insanity at the time of giving instructions for a will, the commission of suicide three days afterward did not invalidate the will by raising an inference of previous derangement." Burrows vs. Burrows, 1 Haggard, 109; Ray's Med. Jurisprudence of Insanity, Sec. 460.

" Chief Justice Parker also held that suicide committed fifteen days after the date of the person's will was not sufficient *in the absence of other evidence* to prove him insane and thus invalidate the will on account of the difficulty just mentioned." Brooks vs. Barrett, 7 Pickering (Mass.), 94.

" Similar views prevailed in Duffield vs. Robson, 2 Harrington, 583, and in Chambers vs. Proctor, 2 Curtiss, 415. In both of those cases suicide occurred the next day after the execution of the will; and in the latter, delusions were proved to exist on the three (days) next previous to the will." Ray's Medical Jurisprudence of Insanity, p. 448, Sec. 460.

In the Brooks case, the court maintained the principle that " if

the evidence be doubtful, the presumption of the law in favor of sanity is to have its effect.''

Dr. Ray lays down the general proposition that '' even when the suicidal act is *unquestionably the effect of insanity* it does not necessarily follow that a will prepared within a short time of it is invalid '' —that is to say, if the will be reasonable. Ray's Medical Jurisprudence of Insanity, p. 449, Sec. 461.

'' If the will be a rational act, rationally done, a suicidal act, or attempt, ought not to invalidate it, because the presumption is either that the will was made before the mind became impaired, or that the derangement was of a kind that did not prevent the judgment from using ordinary discretion in the final disposition of property.'' *Id.*, p. 450, Sec. 462.

Other authorities and text-writers might be cited with advantage, but we prefer to rest our conclusions on this branch of the case upon the opinion of Dr. Ray, on account of his exceptionally concise and correct conclusions of law, as well as on account of this court having in other cases cited his works with approval.

On this branch of the subject, as on the one previously argued, our conclusion is clear to the effect that, even conceding, for the argument, that Miss Bey was insane on the 3d of January, 1893, when she penned the letter that was afterward found on her person, after her death by suicide, there is nothing to show *any causal connection* between the act of suicide and the circumstances surrounding the execution of her last will.

Altogether, our conclusion is that on the 18th day of November, 1892, when Elizabeth Bey executed her will, she was of sufficiently sound mind to fully understand the nature of the testamentary act she executed, and appreciated its effects; and that, consequently, her will is good and valid.

Hence the judgment appealed from must be annulled and reversed.

It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled and reversed; and it is now ordered and decreed that the will of Elizabeth Bey, which was executed on the 18th of November, 1892, be declared legal and valid, and entitled to probate and registry. And it is further ordered and decreed that the aforesaid last will and testament of Elizabeth Bey, deceased, be and the same is ordered to be probated, registered and executed; and that opponents pay all costs of both courts.