26 So.2d 699

ARTIGUE et al. v. ARTIGUE et al.

No. 37168.

April 22, 1946.

Rehearing Denied May 27, 1946.

Edward Dubuisson, of Opelousas, for defendants-appellants.

L. Austin Fontenot, of Opelousas, for plaintiffs-appellees and intervenors-appellees.

FOURNET, Justice.

The plaintiffs, Jules Artigue and Mrs. Flavie Artigue, wife of George King, two of the legal heirs of the late Robert Artigue, instituted this proceeding against their brother Frank Artigue and his wife Lena Arceneaux, legatees under the will of the decedent, to set aside the will and the proceedings thereunder placing them in possession of decedent's estate on the grounds (1) that the formalities required by law for the preparation of a nuncupative will by public act were not complied with and (2) that at the time the will was executed the decedent was insane, as he had been for some time previous thereto and as he continued to be until his death approximately 40 days thereafter.

The defendants denied the formalities were not followed when the will was prepared or that the decedent had ever been insane, either at the time the will was made or previous or subsequent thereto until his death.

The trial judge, without passing on the question of whether or not the formalities for the making of the will were followed, found that the overwhelming preponderance of the evidence showed the decedent was habitually insane before the time of the making of the will, which condition continued until his death, and that the defendants had failed to show the will was executed during a lucid interval; consequently, he rendered judgment in favor of the plaintiffs, decreeing the will to be null and void and of no effect, as well as all proceedings thereunder, which he ordered set aside; further decreeing the plaintiffs and the other heirs of Robert Artigue to be entitled to be sent into possession of his estate upon due proof in proper proceedings. The defendants are appealing from this judgment.

Robert Artigue died on May 28, 1942, leaving neither father nor mother nor children, his only legal heirs being his two living brothers and a sister, the two plaintiffs and the defendant Frank Artigue, and sixteen nieces and nephews, children of two predeceased brothers and one predeceased sister. He left what purported to be a nuncupative will by public act executed on April 17, 1942, wherein he gave, share and share alike "all of the property which I may possess at my death" to the two defendants, Kenry Artigue, son of the defendants and nephew of the plaintiffs being named the executor without bond. This last will was probated on June 15, 1942; the legatees were duly sent into possession of the property and effects of the decedent on October 20, 1942; and the

executor was discharged. This suit was filed on November 23, 1942.

It is the contention of the defendants that the trial judge erred in holding it was incumbent upon the defendants to prove the will was executed during a lucid interval, it being the burden of the opponents of this will to not only prove the insanity of the decedent but also that the will had not been executed by him during a lucid interval, and that such proof by the plaintiffs should establish these facts beyond a reasonable doubt, the same kind of proof being required as is needed to rebut the presumption of innocence in criminal cases.

While a person of unsound mind cannot make a donation either inter vivos or mortis causa (Article 1475 of the Revised Civil Code), one is presumed to be sane until the contrary is affirmatively established; consequently, there is a strong presumption in favor of the validity of a will. Chandler v. Barrett, 21 La.Ann. 58, 99 Am.Dec. 701; Kingsbury v. Whitaker, 32 La.Ann. 1055, 36 Am.Rep. 278; and Wilcox v. City of Hammond, 163 La. 489, 112 So. 375. In rebutting this presumption of sanity it is not necessary that the testator be proved to be notoriously insane. Subdivision 10 of Article 1788 of the Revised Civil Code. It is only necessary to prove that the testator's mental capacity was such that at the moment the will was made he was not of sufficiently sound mind "to fully understand the nature of the testamentary act, and appreciate its effects."

Succession of Bey, 46 La.Ann. 773, 15 So. 297, 301, 24 L.R.A. 577.

[4, 5] A review of the jurisprudence of this court discloses the evidence has been found sufficient to warrant the annullment of the will under attack in only a few instances. The capacity of the testator to make the will and the degree of proof needed to prove his incapacity depends, of course, upon the type of insanity from which he is suffering. Our law recognizes that these types can be divided into two categories, furiosus and mente captus. Persons falling into the latter category are habitually insane and are presumed to be incapable of having a lucid interval whereas those in the former category are recurrently insane and capable of having a lucid interval.

The evidence, in our opinion, conclusively shows the decedent in this case was suffering from a condition that brought about softening of the brain, or deterioration of the brain cells, and that as a result thereof he had begun to show signs of mental incompetence or insanity as early as the fall of 1941, his condition growing progressively worse. About the time the will was made and for some time prior thereto his condition was apparent and notorious in the small community where he resided. It was such, in fact, that it was suggested by some of his friends and relatives that he should be sent to an institution for treatment and by others that the proper authorities should be informed. Also, upon

their suggestion, Mrs. J. D. Bass, daughter of the defendants and a niece of the decedent, who lived in Texas, was sent for on April 15 and was there to take charge of the decedent's business on April 17, the day the will was confected.

The decedent's physician who had not only treated him during his last illness but had also treated and known him for many years, testified that in his condition the decedent was suffering a loss of recordation and was unable to think or to reason and that while it was possible for him to have a lucid interval it was not probable that such an interval would be of a sufficient length of time for him to make the will, he being unable to concentrate for that long or to appreciate the import of the will, designating the medical term for the disease from which the decedent was suffering as paresis.

We are unable to evaluate the decedent's testamentary capacity at the time the will was made from the will itself since it was not written by him in his own handwriting and it does not contain any provision that would indicate he knew anything about his affairs. In fact, we are unable to say from the record whether or not the idea of making the will was originally that of the decedent for we find he was taken to the notary's office by Mrs. Bass and Kenry Artigue, children of the defendants, and later to the notary's home by Frank Artigue one of the defendants and a beneficiary under the will, and Kenry Artigue,

his son, who was named executor without bond in the will, and none of these parties testified.

While as a rule the testimony of the notary and those who witness a nuncupative will by public act will be given great weight in determining the competency of the testator to make the will at the time it was made, it is to be noted that no special defense of a lucid interval was pleaded by the defendants. Their defense was that the decedent was not only sane at the time the will was made but that he was never insane at any time prior or subsequent thereto until his death, and the testimony of the notary and the two of the three witnesses to the will, the notary's wife and secretary, who testified, was to this effect.

The notary testified he had known Mr. Artigue for many years and that although the decedent had come to see him two days before the will was made and although he had seen him on the day the will was confected and several times thereafter, he had never noticed a single incident in connection with his behavior that would have indicated he was incapable of making the will. The notary testified further that when the decedent came to see him two days before the will was made it was with reference to a suit pending against him and he appeared to be very much worried and humiliated, fearing the creditor who had brought the suit against him was going to close his store and sell him out, and that

when the decedent came to his office in the early forenoon of April 17, 1942, to see about his last will and testament, accompanied by Mrs. Bass and Kenry Artigue, the children of the defendants, and to his home later in the day to draw up the will, to which place he was brought by the defendant Frank Artigue and his son Kenry, he appeared to be in perfect mental condition in every respect. The two witnesses to the will who testified simply remarked that they had noticed nothing at the time the will was being made that would have led them to believe the decedent was not normal.

These people are all prominent citizens of the community where the notary lived and although they can be considered as being of unimpeachable character, their opinion as to the decedent's mental condition at the time the will was made is not very forceful when we consider the notary's testimony that the decedent was normal prior to, at the time of, and subsequent to the making of the will in the light of the positive proof in the record to the contrary. It may well be true that on this occasion Robert Artigue did nothing that flagrantly indicated his insanity to these casual observers, but the record shows that the persons who accompanied him and were present when the will was made knew he was insane. In fact, Frank Artigue lived with the deceased and that he was aware of his brother's condition at the time is not disputed for he did not take the stand to refute the testimony offered by the plaintiffs to establish the decedent's mental capacity at this time. We think it was the duty of these people to inform the notary of the decedent's condition so that the notary could have at least satisfied himself of the testator's mental capacity to make the will at that particular time, and having failed to do so, they cannot now be heard to complain.

As pointed out above, there is nothing about the will or the conditions under which it was made from which the decedent's mental capacity at that time might be inferred. However, the notary testified he prepared a memorandum from what the decedent told him he wanted to do that morning and followed his usual procedure and phrasing in drafting the preparatory statement, adding with respect to the disposable portion of the will, "In each sentence as written in the Will, I read from the pencil memo which I had previously made to Mr. Artigue *two or three words at a time* or *a sentence if short,* and he repeated these words to me, and I then wrote them down from his dictation. *This was done slowly and carefully,* and every word of the Will was dictated to me by Mr. Artigue but with the help and assistance which I gave him by repeating him the words of the written memo which I had prepared with him and at his request." (Italics ours.)

While the fact that the decedent repeated the words parrot-like after the notary (as was so aptly pointed out by the trial

judge) does not demonstrate the decedent was insane, it certainly corroborates the testimony in the record, particularly that of the physician who testified the decedent was unable to concentrate long enough to know what the will was about or to understand its import, for while the decedent was not an educated man he could read and write, and, prior to his affliction, he was considered to be a very intelligent person.

It is our opinion, therefore, that the decedent at the time of the making of the will was of unsound mind and incapable of making a last will and testament within the meaning and contemplation of Article 1475 of the Revised Civil Code.

Counsel for the defendants argues seriously both orally and in brief, however, that although there were no exceptions to that effect filed in the lower court prior to the rendition of judgment, there was a non-joinder of parties in that the testamentary executor and the other co-heirs, necessary parties, were not joined in the suit, rendering the judgment null. He contends that to proceed to a determination of the merits of this case without these people would invite an endless multiplicity of litigation and that we should, therefore, notice this non-joinder of parties ex proprio motu.

On this point the record shows that the judgment was rendered and signed in this case on March 31, 1942, and that on the same day in open court counsel, who was also the notary who drew up the will, moved for an appeal, which was granted.

However, on April 3, the defendants again came into court and filed motions for a new trial and for a rehearing. In these motions, for the first time, the issue of non-joinder of parties was urged as one of the grounds for granting these motions. Thereafter, on April 8, the executor named in the will intervened and moved for a new trial, alleging he and the plaintiffs' co-heirs were necessary parties. On April 12 the other co-heirs intervened, seeking to join the plaintiffs in their demands. On April 19 the plaintiffs filed exceptions, objections, and an answer to the intervention of Kenry Artigue, the executor, and an answer to the application of the defendants for a rehearing and a new trial, and, on May 3, the defendants excepted to the intervention of the co-heirs, after having on April 16 obtained time within which to do so. The court, having all of these matters under consideration on May 25 allowed the interventions to stand, overruling all of the exceptions and objections to them, and, on the same day, overruled the motions for a rehearing and a new trial. In the meanwhile, however, and before the trial judge could pass on these motions and rehearings and other pleadings the defendants in the original suit had perfected their appeal by furnishing bond on April 10. Two days later the executor also appealed from the judgment, claiming to have been aggrieved thereby.

It would seem to us that when the defendants filed motions for a new trial and for a rehearing they thereby abandoned

their motion for an appeal. Obviously the trial judge so thought or else he would not have allowed subsequent proceedings to be filed, nor would he have passed on the interventions and motions had he not considered this to be the case. Be that as it may, no motion was filed for the dismissal of this appeal here and the appellees are not pressing the issue.

While we think the trial judge would have been justified in requiring that these people be made parties to the suit had an exception of non-joinder been timely filed, we can think of no good reason why the failure to join them by timely pleadings should prove fatal. Certainly the plaintiffs could not compel their co-heirs to join them in prosecuting this suit and it cannot be said that they can lose their rights in the event these co-heirs refuse to join them. Unquestionably, therefore, they had a right to proceed as they did. And Kenry Artigue, having been previously discharged from his duties as executor under the will of his late uncle, and the property under his administration having been turned over to the named legatees under court order, is without interest to maintain the will under attack. And since no relief is being sought against him in these proceedings he cannot be considered a necessary party. To hold otherwise would, we think, invite a prolongation of the litigation and a multiplicity of suits, the very situation the defendants are allegedly seeking to avoid. The case of Reed v. War-

ren, 172 La. 1082, 136 So. 59, cited by counsel for appellants is neither pertinent nor apposite.

For the reasons assigned the judgment appealed from is affirmed.

O'NIELL, C. J., absent.