30 So.2d 823

**CLANTON v. SHATTUCK.**

No. 38333.

April 21, 1947.

Rehearing Denied May 26, 1947.

Plauche & Stockwell, of Lake Charles, and Foster, Hall & Smith, of Shreveport, for appellant-defendant.

Hunter & Fitzgerald, of Shreveport, for plaintiff-appellee.

McCALEB, Justice.

Benjamin M. Foster committed suicide in the city of Shreveport on April 10, 1944 by shooting himself with a pistol. The day before he took his life he made an olographic will in which he bequeathed all of his property (except his dog and pistol, which he devised to one C. A. Floyd of Atlanta, Georgia, and two $25 war bonds) to Mrs. June Thurman Shattuck of Lake Charles.

In due course, Mrs. Shattuck opened the succession of Foster in the First Judicial District Court for the Parish of Caddo and caused the will to be probated. She applied for letters and was appointed dative testamentary executrix of the succession. Soon afterwards, Mrs. Beulah E. Clanton, the only sister of Benjamin Foster and his nearest of kin, instituted the present suit against Mrs. Shattuck seeking the annulment of the will on the ground that Foster was habitually insane at the time of its execution. Plaintiff charges, in substance, in her petition that she is the heir at law of her brother; that he left neither as-

cendants nor descendants; that he was married but once and divorced; that he died intestate because the will written by him on April 9, 1944 is void in that, at the time it was executed, he was suffering from taboparesis and cerebro-spinal syphilis, which diseases impaired and were destructive of his brain cells and produced in him a state of general and habitual insanity.

After a trial in the District Court, the charges of Mrs. Clanton were maintained and the will declared a nullity. Mrs. Shattuck has appealed from the adverse decision. She contends that the plaintiff has utterly failed to prove her charges and that the record is barren of believable evidence that Foster was insane, either permanently or temporarily, at the time the will was written.

■ The law of the case is well established. Hence, the ultimate question for determination is one of fact, i. e., whether the testator was insane at the time the will was written, as Article 1475 of the Civil Code provides that only persons of sound mind can make donations either inter vivos or mortis causa. On the other hand, since all persons are presumed to be sane until otherwise affirmatively established, a legal presumption exists in favor of the validity of a will. See Chandler v. Barrett, 21 La.Ann. 58, 99 Am.Dec. 701; Kingsbury v. Whitaker, 32 La.Ann. 1055, 36 Am.Rep. 278; Wilcox v. City of Hammond, 163 La. 489, 112 So. 375 and Artigue v. Artigue, 210 La. 208, 26 So.2d 699, 701.

■ In the recent case of Artigue v. Artigue, supra, we remarked: "In rebutting this presumption of sanity it is not necessary that the testator be proved to be notoriously insane. Subdivision 10 of Article 1788 of the Revised Civil Code. It is only necessary to prove that the testator's mental capacity was such that at the moment the will was made he was not of sufficiently sound mind 'to fully understand the nature of the testamentary act, and appreciate its effects.' Succession of Bey, 46 La.Ann. 773, 15 So. 297, 301, 24 L.R.A. 577."

■ A review of the many cases brought to this court in which wills have been attacked on the ground of the insanity of the testator will reveal that there have been but few instances where the evidence has been found sufficient to warrant the annulment of the will. The proof of insanity must be strong and a great deal depends upon the type of insanity involved. Two types are recognized,—furiosus and mente captus. The latter class are those who are habitually insane, whereas, the furiosi are recurrently insane. The habitually insane are presumed to be incapable of having a lucid interval. See Aubert v. Aubert, 6 La.Ann. 104 and Succession of Morere, 114 La. 506, 38 So. 435.[1] Conversely, those of the furiosus type (the monomaniacs and temporarily insane) will be presumed

---

[1] The rule of these cases has been somewhat weakened by the later jurisprudence. However the matter is not important to the decision in the case at bar.

to have made the testament during a lucid interval unless there is strong testimony to show otherwise. An interesting discussion of this subject will be found in Volume Eleven of the Tulane Law Review, pages 429 through 433.

The jurisprudence discloses that the difficulties encountered by suitors assailing wills on grounds of the insanity of the testator have been due, in the main, to their inability to submit the degree of proof necessary to overcome the presumption of sanity. Thus, in each case, the weight of the evidence is the all important factor.

With the foregoing principles in mind, we consider the evidence presented in the instant case.

Ben M. Foster was born in 1908. He was the only son of Ben M. Foster and Beulah Coleman Foster. During his early youth his family resided in Lake Charles. After the death of his father in 1915, when Ben was seven years old, his mother moved the family to Shreveport where they resided with Misses Lottie and Mattie Coleman, sisters of Mrs. Foster. Ben Foster contracted syphilis at an early age. Dr. George G. Garrett, Foster's physician who testified in plaintiff's behalf, stated that fifteen years before the trial he had discovered an initial lesion of syphilis in Foster and had recommended treatment therefor but that his advice was not heeded. Despite the fact that he had become infected with this disease, Foster married and remained with his wife until 1941, when she left him and thereafter divorced him. Foster's mother died during 1941, leaving as her heirs the plaintiff, Mrs. Clanton, and the decedent. Due to the fact that Foster, at the time of his mother's death, was thought to be at least partially insane as a result of cerebro-spinal syphilis, taboparesis and chronic alcoholism (the evidence shows that he consumed about a quart of whiskey or rum per day), his aunts, Miss Lottie and Mattie Coleman, and his sister did not turn over to him his share of his mother's and father's estate. The amount due him was not considerable (about $6,000) and it was believed that he would immediately squander it. However, certain cash was furnished him at irregular intervals.

After his wife left him, Foster went to live with the Misses Lottie and Mattie Coleman and he remained at their home most of the time or until a few weeks before his death (excepting periods when he was in the army, from May 15 to September 7, 1942, and on two other occasions when he was ordered committed to the Veterans Facility Hospital at Little Rock, Arkansas, by orders of the First Judicial District Court).

The medical evidence relative to Foster's insanity is most convincing. Dr. George G. Garrett of Shreveport stated that he had known Foster for over fifteen years and had been his physician off and on for that length of time. He discovered an initial lesion of syphilis when Foster first came

to his office and his diagnosis was confirmed by a Wasserman test. The doctor asserts that he tried to impress upon Foster, without success, the seriousness of the disease and that he did not see Foster again until approximately ten years after his diagnosis, when he was called to Foster's home and found him suffering with an abdominal pain. He says that, from then on, he treated Foster intermittently for a period of four or five years, or until the time of his death; that the disease had entered the decedent's central nervous system and that he diagnosed it as cerebro-spinal syphilis. Dr. Garrett also says that Foster was suffering from taboparesis, which is a form of cerebro-spinal syphilis and that he had had it for several years. He stated: "I would say that this man had ideas of hallucinations and he had ideas of persecution; I thought especially towards the ones that maybe had been the kindest to him. I had him in the hospital on several different occasions and on some of these occasions, at times he didn't know where he was. He would hardly recognize me as his doctor when I would come in to see him. On one occasion, I saw him in the late afternoon, we were treating him, and he had promised to stay with me until I could get him straightened out, most all of these times he was under the influence of alcohol; not all the time, but most of the time. Well, I went back the next morning to see him and went to his room and I found that he had slipped out of the fire escape that night sometime

without permission from the Sisters—he was in the Schumpert Sanitarium—or from any of the doctors. I didn't see or hear from him for some little time. When he came back, he made no mention of that whatever. He acted, I thought, abnormal in many ways."

The sum and substance of Dr. Garrett's testimony is that Foster had been habitually insane since he had come back from the Army in September of 1942.

To the same effect is the testimony of Dr. Willis P. Butler, prominent Shreveport physician, who has held the position of Coroner of Caddo Parish for thirty years. His diagnosis of Foster was cerebro-spinal syphilis and taboparesis complicated by chronic alcoholism. Dr. Butler remarked "he was emotionally unstable and had lack of insight". And, again, in speaking with respect to the effect of the disease on Foster, he said: "I think his was rather advanced, and certainly not sufficiently treated or if it was the treatment did not have very good effect."

The testimony shows that Foster was never gainfully employed after 1941 except for a few weeks at a time. As stated above, he lived with his two aunts at their home in Shreveport. During the greater part of this period, that is, from 1941 up to the time of his death in 1944, Foster was constantly drinking and was subject to nervous spells during which his body would vibrate or shake. His aunts testified that he threat-

ened to commit suicide on more than one occasion and that, on another (after his return from the Veterans Hospital in 1944), he threatened to kill Miss Lottie Coleman. His behavior made the lives of his aunts so insupportable that, during April 1943, they found it necessary to report the matter to the Coroner. Thereafter, he was committed by order of the First Judicial District Court to the Veterans Facility at Little Rock, Arkansas, as an incompetent person. He was released from the hospital in July 1943 and returned to Shreveport.

In September of 1943, Foster went to work for the State Board of Health in Alexandria. He left his position without notice and returned to Shreveport in the early part of January 1944. On January 22, 1944, he was committed again to the Veterans Facility at Little Rock as an incompetent. He was discharged from the hospital on February 24th and returned to Shreveport. It was after his release from the Veterans Facility that he threatened to shoot his aunt, Miss Lottie Coleman. The disease with which Foster was afflicted caused him to have delusions of persecution, i. e., he believed that the Misses Coleman were conspiring against him and keeping him from obtaining the money inherited from his mother. He also believed that Miss Lottie Coleman was entirely responsible for his incarceration in the Veterans Facility at Little Rock.

On March 10, 1944, Foster went to Lake Charles to see the defendant, Mrs. June Shattuck, to whom he refers in correspondence as "Cousin June" and sometimes as his "aunt". (Mrs. Shattuck is not a relative—her husband and Foster are second cousins.) He stayed in Lake Charles three or four days before returning to Shreveport. Upon his return, he did not go back to live at his aunts' home but engaged a room at the Inn Hotel where he resided until his death.

The testimony discloses that, after his return from Lake Charles, Foster's fear of and hate for his aunts, the Misses Coleman, became more marked than ever before. He was drinking very heavily and brooding over his imaginary plight. On April 9, 1944, he made his will and, on the same day, wrote several letters which clearly disclose the condition of his mind. The next day he committed suicide. The letters written by Foster on the day he wrote the will have, we think, vital bearing upon the conclusion to be reached with respect to his sanity. They manifest that his decision to commit suicide resulted from his delusion of persecution by Miss Lottie Coleman and that he believed that suicide was the only method by which he could prevent her from interfering in his affairs. These letters further demonstrate that he felt that, by writing his will in favor of the defendant, he would keep Miss Lottie Coleman from getting his meager estate and thus obtain some measure of revenge against her. For instance, he wrote the defendant, Mrs. June Shattuck, as follows:

"Rather than publicize family troubles— I've decided to cash-in my chips & call it 'quits'. *You* know Lottie has caused this!

Am enclosing letters and papers you saw last week—have *her* 'interdicted' (if *you* think it right). Also enclosing my 'Last Will & Testament'—Everything, except 'Dog' & 'Gun' to you that I own or possess—*You* are my second Mother

 Ben"

To his sister, the plaintiff, he wrote:

"Dear 'Weezie'

Sorry it has to end up this way (*Very*), but after *two* 'Competent Ratings' from Veterans Hospital (Cousin June will have them)—maybe *you* don't know about this? —Lottie has caused me so much humiliation and embarrassment here & L C that I've decided to 'check-out' rather than take the thing to court. Don't you think that best?

 All my love to the finest
 sister & the cutest neist,
 Ben"

He wrote to the undertaker respecting his burial and disposal of his effects, instructing him to send all papers, etc., to "my aunt Mrs. Frank Shattuck". In the same note, he states:

"Lottie Coleman (another aunt) at 636 Jordan—Bh–3–7574—has quite a bit more of my money than necessary to pay transportation of the 'corpse' to Lake Charles * * * take *everything* out of this room over to McCooks & hold it for—'my favorite Aunt' Mrs. Frank Shattuck 2207 Blvd. Lake Charles La. and notify her she has been willed my property. *Do not* let Lottie *Coleman* (the *rotten* aunt) touch anything * * *.

P.S. Make me look 'pretty' Brooks—burial in Lake Charles.

P.P.S. *Never* trust an old maid aunt!

 B.M.F."

Another letter, written to Miss Lottie Coleman on the same day, couched in the most sarcastic terms, states:

"My *very* considerate *Aunt* Lottie:

You have had me committed, on two separate occasions, to the Veterans Hospital. The Medical Staff determined me to be competent each time (as *you* know by the letters you received).

I thought, this last time, that I would enter suit against you. I have changed my mind! Due to your habit (consistent) of opening my mail, forging my signature to checks, etc., *I'm* taking the 'hard way' out, instead of a suit.

Parties in Lake Charles will attend to collecting my part of the Estates according to my *will*.

*You*—I wonder how you will enjoy it down there with Satan (You'll probably 'take over' and run him out!)

This *might* 'wake you up' and maybe you'll leave *Mattie* alone.

*You* are rotten,

 Ben"

It is our opinion that the foregoing letters, written at the time of the making of the will, furnish most potent evidence of an unsound mind. It is difficult to believe that a sane man (36 years of age) would seriously consider the matters which consumed Foster's thoughts, governed his conduct and caused him to destroy himself.

■ The evidence submitted by the defendant in support of the will consists of the testimony of several acquaintances who state that, in their dealings with Foster, he appeared to be perfectly sane. In addition, defendant offered the deposition of Dr. T. H. Watkins of Lake Charles, who examined Foster in a professional capacity during the month of March 1944 when he was visiting the defendant. Dr. Watkins said that he found Foster to be in a nervous condition "as would follow dissipation" but that the decedent was not insane. We attach little importance to the testimony of Dr. Watkins partly because he saw Foster on one occasion only but mainly for the reason he declined to state the nature of the illness from which Foster was suffering on the ground that it was "a privileged communication". His refusal to answer any questions in regard to the nature of Foster's illness effectively deprived plaintiff's counsel of their right of cross-examination, thus nullifying consideration of any opinions expressed by Dr. Watkins on direct examination.

We do not find it necessary to discuss in detail the testimony of the several lay witnesses produced by the defendant who give the opinion that Foster was sane. Suffice it to say that all of these witnesses, except a liquor dealer and a bartender, were mere acquaintances who knew little of Foster's habits at or near the time the will was written. The liquor dealer and the bartender readily admitted that Foster spent his last days drinking in the saloon of the Inn Hotel. We find their opinions concerning his sanity to be unimpressive.

■ After a careful review of the record, we are satisfied that Foster was not of sound mind at the time he wrote the will as he did not fully understand the nature of his testamentary act and appreciate its effect. In reaching this conclusion, we have not found it necessary to determine that Foster was habitually insane and, therefore, presumed not to have had lucid intervals for,—conceding that there were times when Foster's mind was sound, we are convinced that the will was not written during a lucid interval.

The leading case of Kingsbury v. Whitaker, supra, upon which counsel for defendant heavily rely, is clearly distinguishable from the matter at hand. There, the Court found that the testator, who was a heavy drinker and subject to periods of despondency, wrote the will during a lucid interval because the will itself, considered in connection with letters written by him about the time of the making of the will, clearly showed that he was a man of more than ordinary intelligence, "of considerable

learning, and with commendable facility of writing, a close observer of men, things, and of passing events, and of strong and ardent convictions on business, politics, political economy, and many other subjects." Conversely, in Foster's case, the evidence unfolds the story of an habitual drunkard, afflicted with syphilis and paresis who, during the advanced stages of the disease, is beset with delusions of persecution to such an extent that he not only believes that he must write a will in order to deprive the persecutor of the use of his estate but that he must take his life in order to free himself from the difficulties surrounding him. Such delusions are not mere eccentricities. They partake of a mania and, as it existed and was active at the time the will was written, the judge of the District Court was correct in annulling the testament.

The judgment appealed from is affirmed.