65 So.2d 345

**CORMIER et al. v. MYERS.**

No. 40824.

April 27, 1953.

Plauché & Plauché, Lake Charles, for plaintiffs-appellees.

Lawes, Cavanaugh & Hickman and Fred C. Selby, Lake Charles, for defendant-appellant.

PONDER, Justice.

The defendant has appealed from a judgment decreeing a nuncupative will and testament null and void.

After hearing the arguments in the case and carefully examining the record, the briefs filed herein and the written reasons given by the district judge for his judgment, we have arrived at the conclusion that the facts and the issues are properly stated and disposed of and, therefore, adopt his written reasons as our opinion in this case, viz.:

"This is a suit to invalidate the last will and testament of the late Mrs. Laura Biesenberger Teal, in the nuncupative form by public act, on two grounds: (1) That the testament was not dictated by the testatrix to the Notary, and was not her testament, and (2) that the testatrix was insane when the will was made, and, therefore, lacked testamentary capacity.

"The plaintiffs are the sister and nephews and nieces of the testatrix, and the defendant is the instituted heir and universal legatee. Should the will be declared invalid the plaintiffs as next of kin and blood relatives will

inherit the estate. Defendant is not related in any degree to testatrix.

"At the time of her death and for about three years prior thereto, testatrix was an inmate and paying guest in the home of defendant in Lake Charles, who, in addition to her own children, boarded and lodged aged and infirm people for compensation.

"At the time of her death testatrix (called Aunt Laura) was 86 years old, more or less. Her husband had died many years before. She left neither ascendants nor descendants, her own living blood relatives being her sister, Mrs. Georgiana Biesenberger and nephews and nieces, children of a predeceased brother.

"The testatrix was illiterate. She could not even write her name. She spoke little English, and understood it less. The evidence shows that for practical purposes Aunt Laura spoke and understood in her limited capacity only French.

"About two or three years after the death of Aunt Laura's husband, which occurred in 1939, Aunt Laura's mental decline began, and the evidence unmistakably showed that the mental deterioration which commenced at that time continued and became progressively worse until the time of her death.

"For a period of about three months during the early part of 1946 the tes-

tatrix was placed in the home of Mr. and Mrs. D. M. Landry, who were paid $100.00 a month to care for the testatrix. Prior to her stay in the home of D. M. Landry, and for many months thereafter, the testatrix was kept in St. Mary's Hospital in Rayne, Louisiana. She was not in the hospital as a medical patient, and the only reason for her incarceration was that she might have constant attention by nurses.

"Finally during the latter part of August, 1947, Aunt Laura was entered as a boarder and lodger in the defendant's home, where she remained until her death in 1950. Defendant was paid $100.00 per month, and all expenses, for the board and keep of the testatrix. The monies paid to Mr. Landry, to St. Mary's Hospital, and to the defendant for the care of testatrix were advanced by her nephew-in-law, C. M. Fontenot, who is a responsible citizen of Jefferson Davis Parish, and is the husband of one of the plaintiffs. Most of the funds advanced by Mr. Fontenot were reimbursed to him out of the income of the testatrix from the property which was administered by Mr. Fontenot, but the latter testified that he had personally paid over $1,700.00 of his own money which had never been paid back to him, and which apparently he did not seek to have reimbursed to

him. Mr. Fontenot for many years handled the business and affairs of the testatrix, and the latter appeared to have placed well justified and complete confidence in her nephew-in-law.

"Her last will and testament was executed on August 5, 1949, in the home of defendant, and the Notary who took the will is defendant's personal attorney, and the witnesses to the will are her close friends and well-wishers.

"Mrs. Robinson and Mrs. Barnett, her nieces, testified that for a long time prior to her entering defendant's home, testatrix could recognize none of her relatives or friends, spoke little, and understood nothing. So also testified Mrs. DeBellevue, a grand-niece.

"Mr. and Mrs. D. M. Landry, in whose home the testatrix was placed for three months in the early part of 1946, testified unequivocally that Aunt Laura was completely out of her mind when she was at their home; the testatrix thought Mrs. Landry was 'Neenah' or 'Leenah' which was the name of the sister of the testatrix; and she also thought that Mr. Landry was 'Richard' which was the name of the tenant on Aunt Laura's farm.

"Mrs. Gueno, practical nurse who daily attended testatrix for several months in early 1947 at St. Mary's Hospital in Rayne, testified similarly.

as did Mrs. Benoit who knew testatrix for 20 years.

"They also testified that testatrix could not feed or dress herself, and was unable to attend to her wants. Mrs. Gueno said that testatrix often would secret bread from her tray and hide it under her pillow for her 'cat', which existed only in the childish fancy of Aunt Laura.

"The Rev. Evariste Hebert, Pastor of testatrix's church who gave her communion and spiritual consolation at defendant's home, testified she was completely insane during the entire time she was in defendant's home.

"Mr. C. M. Fontenot likewise testified that she recognized nobody, could not understand any of her affairs that he tried to explain to her, that her mind was blank, and she understood nothing.

"This testimony was further corroborated by Mrs. Jack Cormier, whose husband was a cousin of the plaintiffs; and it was further corroborated by Mr. and Mrs. Joe Biesenberger, who are, respectively, a nephew and niece-in-law of the testatrix.

"The principal witnesses for defendant, who testified to testatrix's soundness of mind, were the defendant herself, the three witnesses to the will (Mrs. Mehaffey and Misses Sells and Bradford), Dr. Steve F. Price, and Miss Grace Pryor.

"Dr. Price is a general practitioner. He saw testatrix twice in the middle part of 1950. Dr. Price did not examine her for her mental condition; he had no record of his visits or diagnosis except the dates, but he said that he thought she knew what she was doing. Dr. Price was too indefinite and uncertain in his testimony, was drawing on his memory instead of records, and, in fact, was substituting for his partner who actually treated testatrix in 1950. His partner, Dr. Whitsell, is now in the military service.

"Miss Grace Pryor visited defendant's home because her grandmother is a guest there. She thought testatrix was mentally all right. She was firm and emphatic, and, indeed, almost enthusiastic, in her statement that defendant should have the property because defendant was good to Aunt Laura (testatrix), and Aunt Laura wanted her to have her property.

"Mrs. Mehaffey, a witness to the will, whose sister was a boarder of defendant, thought testatrix was sane because she did not try to escape, and was quiet, composed and reserved.

"The Misses Sells and Bradford, both school teachers, who also witnessed the will, together with Mrs. Mehaffey, seem to have been accommodation witnesses to the will for defendant. They knew little about testatrix's real mental condition, having never con-

versed with her, but they gave an interesting account of the confection of the will.

"Before reciting the confection of the will, it is best first to get the setting. The place was the home of defendant where testatrix was a boarder for three years prior thereto, and who had to be cared for by defendant like a child. The Notary was defendant's personal attorney, and the witnesses were all close friends and well-wishers of defendant. Testatrix could speak little English; she was illiterate; she could not even write her name, and understood only French for practical purposes.

"The defendant, who was to be the instituted heir and universal legatee, and who also spoke French, was the interlocutor between testatrix and the Notary at the commencement of the preparation of the will.

"When all parties were present in a room in defendant's house for the writing of the will, defendant announced to testatrix that the lawyer had come to make her will, and it was necessary for her to put in writing that she wanted her (defendant) to have her property.

"The Notary asked testatrix if that was true, and testatrix answered in French, 'oui', meaning yes.

"The Notary had with him a previously prepared memorandum of the bequests which he had secured from the defendant over the telephone. According to the Notary's testimony, after he had written in longhand the preamble of the will he then read to Aunt Laura each of the bequests, and had her attempt to repeat it to him, phrase by phrase. He read the dispositions, part by part, in English, and the testatrix attempted as best she could in her broken English to repeat same. The Notary testified that he then wrote down the dispositions as repeated by Aunt Laura. He testified that he had her repeat portions of the bequest more than once on certain occasions, indicating both the faulty locution of the testatrix, and here entire lack of comprehension of the effect of the words. The witness further testified that after some of the portions of the will were read, the testatrix responded by saying, 'Oui'.

"Although it makes no difference in the decision of the court on this point, all of the witnesses except Mrs. Bradford testified substantially that the Notary wrote down the bequests, part by part, and then read them to the testatrix, who attempted brokenly to repeat them, or to affirm the bequests by saying, 'Oui'.

"It is clear that the will as written by the Notary did not represent the dictation or original thought of testatrix, but represented the thought and dictation of defendant and the Notary.

Defendant alone understood French. Testatrix did not understand what was read back to her, because she did not understand English in any real sense, and even if she had, she was mentally incapable of doing so.

"What interpolations were made in French to testatrix by defendant, only defendant knew, because neither the Notary nor the witnesses spoke or understood the language and testatrix was bereft of reason.

"This case is even weaker for the sustaining of the will than Artigue v. Artigue, 210 La. 208, 26 So.2d 699, where the nuncupative will was set aside because it was confected in the manner done in this case, and because of testator's mental incapacity. Here, as in the cited case, testator repeated phrase for phrase with the Notary like a parrot, but in the cited case, unlike here, the Notary visited and discussed business with the testator two days before making the will, and the Notary had known the testator for many years; while here the Notary saw testatrix only once in his life, and that was at the time the will was made.

"See also the case of Succession of Theriot, 38 So. 471, 114 La. 611, where it was held that the will was invalid for want of requisite dictation where the testator handed the Notary a written memoranda of his intentions, saying 'comme ca, comme ca', and also because

the universal legatee and the Notary suggested to the aged testator what the disposition should be, and, in fact, made the will themselves, instead of making it the free and independent act of dictation of the testator.

"Succession of Pizzati, 218 La. 549, 50 So.2d 189, is different from the instant case. There the will was an olographic will, entirely written by testatrix. While she was interdicted sometime after she made her will, and her senile dementia finally reached the last stage where she had no reason at all, medical experts who examined her at the time she made her will testified to her testamentary capacity. Also her conduct of her affairs proved that the testatrix had lucid intervals. Here we had no medical testimony (including Dr. Price), and testatrix transacted no business whatsoever.

"While our law (Article 1492, [LSA–]C.C.) does not recognize duress, force or undue influence unless they are present at the making of the will, yet such incidents are evidence of the testamentary incapacity and mental weakness of the testatrix.

"The allegations that plaintiffs neglected and abandoned testatrix for years before her death is not in any way borne out by the record. The plaintiffs were as solicitous of their aunt and sought to and did assist her, as best they could.

"While testatrix was living with defendant, testatrix executed a general power of attorney in favor of her nephew-in-law, C. M. Fontenot, who had previously and who subsequently handled all her affairs, including the granting of an oil lease on the land. Mr. Fontenot testified the oil company refused to take a lease direct from testatrix because of her mental condition but would take the lease from him through a power of attorney executed by the testatrix. Defendant signed as a witness to the power of attorney, knew of Mr. Fontenot's relationship to testatrix, and the latter's entire reliance on the former, and yet when the will was to be made defendant did not notify Mr. Fontenot, but, on the contrary, notified only her own attorney and witnesses.

"Our jurisprudence is that the capacity to make a will is tested at the time the will is made, and that the presumption of sanity continues until proved otherwise.

"In this case it was proved entirely to my satisfaction that before, at the time of, and since the making of the will in question, the testatrix was of unsound mind, and lacked testamentary capacity.

"Although the proof in this case is amply sufficient to convince the court of the testamentary incapacity of the testatrix in fact, such a conclusion is

further strengthened by the presumption which the jurisprudence has firmly established, which is that if testator's insanity is shown to be habitual and constant, there arises a presumption of insanity at the moment of the confection of the will. In this respect the law distinguishes between two types of insanity—furiosus and mente captus. Persons in the latter class are to be distinguished from those in the former, in that the mente capti cannot have a lucid interval, but are consistently and permanently deficient, whereas the furiosi are only recurrently insane. See Artigue v. Artigue, supra, and Vol. 11, Tulane Law Review, p. 429, et seq.

"Without the benefit of expert medical testimony, but solely from the testimony of the witnesses, and from the discussion of Mr. Justice Hawthorne in Succession of Pizzati, 218 La. 549, 560, 50 So.2d 189, it is clear that testatrix was in the last state of senile dementia when she made her will. The definition quoted by Mr. Justice Hawthorne fits the testimony here, to-wit:

" 'Beginning at the origin, weak and decrepit old age is fond of the simple and quiet of the fireside; and as the disease progresses the person attacked becomes uninterested. The thoughts become contracted, an abnormal failing memory, dullness and apathy, ideas of place and time fail, and faces are forgotten. The conversation becomes

childish. The person becomes untidy, untidy even to squalidness. There are moments of depression and moments when the person is highly elated. These conditions continue and grow worse. Then come the illusions, depressions, and hallucinations, softening of the brain, insanity, and dementia, and that which is worse than the fatal end, the blank mind.'

"It was testified that testatrix loved defendant. If so, it was because of her childishness and senility, since defendant for her care of Aunt Laura was adequately paid for her services. If testatrix had been sane, she might have appreciated defendant's attentions, but not loved her to the extent of constituting her her sole heir and universal legatee to the exclusion of her blood relatives (plaintiffs), who, as admitted by defendant, testatrix had never spoken ill of. All of the relatives of testatrix who testified spoke warmly of the love and affection which existed between them and their Aunt Laura.

"The public policy of this State, as expressed in Article 1489 [LSA-]C.C., prohibits those who attend a sick person, or who wait on them professionally during their last illness, from benefiting by a donation inter vivos, or mortis causa, because of the influence they can exert over the ill. While the keeper of a boarding house for the aged and infirm is not included

in this category by letter, the spirit is there. To establish the validity of a will made under the circumstances as described here would be establishing a dangerous precedent, and might encourage others charged with the care of the aged and infirm to prey upon their senility. A court must look upon such cases with grave suspicion, and must scrutinize the evidence and the circumstances with extreme care, to the end that the weak and incapable shall not be bent to the will of the greedy and the artful."

For the reasons assigned, the judgment is affirmed at appellant's cost.