103 So.2d 276

Succession of Mrs. Julia Hochfelder
FISHER.

No. 43442.

May 26, 1958.

Dreyfous & Kalinski, George A. Dreyfous, Edward A. Kalinski, New Orleans, for appellant.

Clay, Coleman, Dutrey & Thomson, Jacob J. Meyer, by James Julien Coleman, Felix O. Rousset, New Orleans, for appellees.

HAWTHORNE, Justice.

This suit was brought by the two surviving brothers of Mrs. Julia Hochfelder Fisher to have the residuary legacy in her will declared invalid on the ground that the residuary legatee, the First Church of Christ, Scientist, in Boston, Massachusetts, is an unincorporated association and hence incapable of receiving a donation mortis causa under Louisiana law, and also because the legacy is prohibited by Article 1489 of our Civil Code. The legacy which the testatrix' brothers are trying to overthrow reads:

"The balance and remainder of my estate, real and personal, that I die possessed of consisting principally of the real

estate bearing municipal number 2403 Carondelet St., New Orleans, La. more fully described in my title, I wish sold by my executor at private sale, and from the proceeds thereof and from whatever cash I leave, I wish my debts to be paid, as well as the costs and expenses of my succession proceedings, and also to be paid therefrom are the foregoing cash legacies, and the net balance I leave and bequeath to The First Church of Christ, Scientist (also known as The Mother Church), of Boston, Massachusetts, for the promotion of the cause of Christian Science."

By order of the district judge the First Church of Christ, Scientist, in Boston, Massachusetts, was made a party to these proceedings in spite of the opposition of the testatrix' brothers, who argued that the First Church, being an unincorporated association, could not appear in court in its own name. See Art. 446, La.Civ.Code.

After trial on the merits the district judge concluded that the First Church of Christ, Scientist, in Boston, Massachusetts, had capacity both to appear as a party in this suit and to receive the legacy left by Julia Hochfelder Fisher, and he also held that the legacy does not violate Article 1489 of the Civil Code because the First Church "is not a doctor of medicine or a minister of religious worship within the contemplation or spirit" of that article. From the trial judge's dismissal of their suit the testatrix' brothers have appealed.

Julia Hochfelder, divorced wife of Philip H. Fisher, died in New Orleans in 1955, leaving no forced heirs. Her will containing the residuary legacy here being questioned was admitted to probate, but when the testamentary executor took steps to sell the property at 2403 Carondelet Street in New Orleans, the testatrix' brothers, Bernard Hochfelder, M.D., and Joseph K. Hochfelder, filed this suit. The record shows that in 1939 Mrs. Fisher became a member of both the First Church of Christ, Scientist, in New Orleans and the First Church of Christ, Scientist, in Boston, Massachusetts—the Mother Church —, and that she was listed as a Christian Science Practitioner in the Christian Science Journal from 1943 until her death in 1955. Mrs. Fisher was devout, attended church twice a week in New Orleans, made several trips to Boston to visit the Mother Church, and regularly read the Christian Science Quarterly, the Christian Science Journal, and the Christian Science Sentinel, all three of which are published by the Christian Science Publishing Society of Boston, as well as Science and Health, Church Manual, and Prose Works, written by Mary Baker Eddy, the founder of Christian Science. In the years immediately preceding her death the testatrix lived in a large apartment at 2403 Carondelet Street with her two bachelor brothers, appellants, and their cousin, Edgar A. Steiner, for whom she kept house. A few years be-

fore her death, the exact time is not known, Mrs. Fisher developed cancer, but because of her religious belief did not seek medical attention. Up to almost the day of her death Mrs. Fisher continued to supervise the running of the house, attended church and visited her office, but as she grew more desperately ill and spent increasingly long periods of time shut up in her room, her relatives tried to persuade her to see a doctor, which she refused to do because of religious scruples and because she was relying solely on "prayer and faith". However, the poor woman did consent to be taken to the hospital a couple of days before she died. It was in August of 1954, when she was already seriously ill with cancer, that Mrs. Fisher made the will naming the Mother Church in Boston her residuary legatee.

Appellants contend that the First Church of Christ, Scientist, of Boston, Massachusetts, lacks capacity to receive the legacy willed to it by their sister because the church is an unincorporated association, and also because the legacy is prohibited by Article 1489 of the Louisiana Civil Code, the Church having performed the functions of both a doctor and a minister during the testatrix' last illness. As an incident to their first ground of attack on the residuary legacy, appellants also maintain that the Mother Church, being an unincorporated association, is prohibited by Article 446 of the Louisiana Civil Code from appearing in its own name as a party in this suit.

The first question which we will consider is whether the First Church of Christ, Scientist, in Boston, Massachusetts, also known as the Mother Church, is legally capable of receiving Mrs. Fisher's legacy, and, incidentally, whether it can appear in its own name in these proceedings. For a proper solution of this problem it is necessary to set forth a brief history of how the Christian Science Church was organized, and also the Massachusetts law under which this organization took place.

It has been the law of Massachusetts for more than one hundred years that an unincorporated religious society may receive, hold, and use property, for which purposes these associations are constituted corporations. The origin of the statutory power vested in these societies was Statutes of 1811, Chapter 6, section 3, now General Laws of Massachusetts, Chapter 68, Section 12, which provides:

*"Powers of Unincorporated Religious Societies.*—Unincorporated religious societies shall have *like power as incorporated societies* [1] to manage, use and employ, according to its terms and conditions, any gift or grant made to them; they may

1. All italics in Massachusetts statutes and cases cited in this opinion are ours.

elect trustees, agents or other officers therefor, and *may sue for any right* which may vest in them in consequence of such gift or grant; for which purposes they shall be corporations."

In the case of Silsby v. Barlow, 16 Gray 329, 82 Mass. 329, the .Supreme Judicial Court of Massachusetts explained that the Commonwealth had adopted the above statute because:

"Originally all our religious societies were corporate bodies. The towns at first exercised parochial powers, most of the people of this state being of one denomination. But as varieties of opinion sprung up, it became necessary to separate the parochial from the municipal business, and the parishes formed separate organizations. Other religious societies were incorporated by special acts; but many congregations remained unincorporated. Some persons had conscientious scruples against corporations, and others preferred to manage their religious affairs in a different way. The St. of 1811, c. 6, § 3, was enacted for the benefit of such persons. It enabled unincorporated religious societies to take and hold property, manage, use and employ the same, choose trustees, agents and officers therefor, and *constituted them corporations so far as might be necessary.*"

It is now well settled in Massachusetts that the effect of the Massachusetts statute set forth above is that for the pur-- pose of taking, holding, and transmitting property, a voluntary religious society possesses all of the qualifying attributes of a duly organized corporation. First Baptist Church of Sharon v. Harper, 191 Mass. 196, 77 N.E. 778, and cases therein cited.

Moreover, the First Church of Christ, Scientist, in Boston, Massachusetts, has by a special act of the Massachusetts legislature been expressly empowered as a body corporate to receive and hold real and personal property without specific limitation as to the value of the property. Thus, Massachusetts Special Acts of 1917, Chapter 132, entitled "An Act to Authorize the First Church of Christ, Scientist, in Boston, Massachusetts, to Hold Additional Property", provides:

"Section 1. The First Church of Christ, Scientist, in Boston, Massachusetts, *a body corporate,* is hereby authorized *to receive,* acquire, and hold *real estate and gifts of money* and other personal estate for religious, educational and charitable purposes, and to manage, improve, sell and dispose of the same for such purposes, subject to the terms of any trust set forth in any deed, conveyance, bequest or devise of any such estate which may now exist or may result by implication or force of law, with such limitations as may by law govern such trust, anything in the laws of the commonwealth to the contrary notwithstanding.

"Section 2. All deeds, gifts or grants and *all devises* and bequests heretofore or hereafter *made to The First Church of Christ, Scientist, in Boston, Massachusetts* * * * shall be deemed as giving, granting, conveying, devising or bequeathing the property mentioned in such instruments to The First Church of Christ, Scientist, in Boston, Massachusetts, unless the contrary clearly appears from the instrument, and the titles passing respectively by such instruments shall be and the same hereby are vested in The First Church of Christ, Scientist, in Boston, Massachusetts, subject to any limitations governing any trust expressed in any such instrument."

Turning now briefly to the organization of the Christian Science Church in Massachusetts, we find that Mary Baker Eddy, the founder of Christian Science, was the leader in the organization of an incorporated church, whose charter was obtained in June, 1879. Its name was the Church of Christ Scientist, and Mrs. Eddy became its pastor. This continued until 1889 when the members of the new religion dissolved the corporation, resolving to continue as a voluntary association of Christians, retaining however the name of the original corporate organization. This "voluntary association of Christians" continued to meet and hold services until 1892, when Mrs. Eddy began planning a reorganization of her church. Another incorporation was proposed but Mrs. Eddy decided not to have the church incorporated, executing instead a deed of trust conveying land in Boston to four persons named in the deed "as trustees as hereinafter provided and to their legitimate successors in office forever" upon express trusts specified in eleven numbered articles, the first article reading as follows: "Said grantees shall be known as the 'Christian Science Board of Directors', and *shall constitute a perpetual body or corporation under and in accordance with section one, Chapter 39 of the Public Statutes of Massachusetts.*[2] Whenever a vacancy occurs in said Board the remaining members shall within thirty days fill the same by election. * * *" Other trusts were to build a church on the land conveyed, "to elect a pastor, reader or speaker to fill the pulpit who shall be a genuine Christian Scientist," and to maintain public worship in the church in accordance with the doctrines of Christian Science. At a meeting held on September 23, 1892 the First Church of Christ, Scientist, in Boston, Massachusetts, was

2. Pub.Sts. c. 39, § 1, now G.L. c. 68, § 1, provided: "The deacons, church wardens, or other similar officers of churches or religious societies, and the trustees of the Methodist Episcopal churches, appointed according to the discipline and usages thereof, shall, if citizens of this commonwealth, be deemed bodies corporate for the purpose of taking and holding in succession all grants and donations, whether of real or personal estate, made either to them and their successors, or to their respective churches, or to the poor of their churches."

formally organized, the records of the church beginning at this time. A president, clerk and treasurer were elected and rules for the government of the church were adopted. In 1903 the Christian Science Board of Directors were increased from four to five members, this Board having since 1901 transacted all of the business of the church. For the foregoing history of the Christian Science church, see Dittemore v. Dickey, 249 Mass. 95, 144 N.E. 57.

■ From the above it is clear that the Mother Church has legal capacity in Massachusetts to receive a donation mortis causa and to appear in its own name as a party in any suit involving such a donation. Furthermore, after careful thought we have concluded that the Mother Church has these same legal capacities in Louisiana.

■■ At this point we will note briefly that there is a great deal of controversy between the opposing parties in this case over the nature of the property which Mrs. Fisher willed to the Mother Church—that is, whether it is movable or immovable property. Appellees argue that it is movable property because the will provides that the real estate at 2403 Carondelet Street is to be sold, that from the proceeds of the sale, as well as from any cash left by the testatrix, all debts and legacies are to be paid, and that the cash balance left in the estate is then to be turned over to the Mother Church. Appellants, on the contrary, take the position that the legacy is of immovable property, citing as their authority for this contention our decision in Succession of Herber, 128 La. 111, 54 So. 579. We fail to see how classification of the property in the residuary legacy as movable or immovable is material in the present suit. It is true that under conflict of laws principles the lex rei sitae governs as to wills of immovable property, but when a will of personal property is made in the place of the domicile of the testator, the general rule is "that it is to be construed according to the law of the place of his domicil, in which it is made." Story, Conflict of Laws, ch. XI, Wills and Testaments, pp. 641–676, esp. pp. 651–652, 663 (8th ed. 1883). In the instant proceedings Louisiana is not only the situs of the immovable but also the domicile of the testatrix and the place where the will was made. A study of the Louisiana cases involving the inheritance of Louisiana property by a foreigner reveals that either the positive law and the public policy of this state, or the spirit of comity, are the controlling factors in such suits, and not the nature of the property involved in the litigation. For example, in our decision in Succession of Petit, 49 La. Ann. 625, 21 So. 717, 718, we refused to allow a French child to inherit his natural father's personal property in Louisiana be-

cause we would have had to "disregard the spirit and text of the Code" to do so. And in Succession of Robert, 2 Rob. 427, we said:

"It is first necessary to remark, that the estate of the testatrix is composed exclusively of moveables; and it is undoubtedly a clear and correct principle on the subject of the conflict of laws, that, with regard to moveables, the capacity or incapacity of a testator is to be determined by the laws of his domicil. Story, No. 383, says, 'It follows as a natural consequence of the rule which we have been considering, (that personal property has no locality,) that *the laws of the owner's domicil* should in all cases determine the validity of every transfer, alienation, or *disposition,* made by the owner, whether it be *inter vivos* or *post mortem.*' "

Hence we think that it is immaterial whether the legacy here being attacked is of movable or immovable property.

██ The First Church of Christ, Scientist, in Boston, Massachusetts, is, among other things, a limited corporate body created by the Massachusetts legislature, and therefore all of the church's legal rights and powers derive from and must be determined by the law of that state. Cf. Restatement of the Law of Conflict of Laws, p. 388, ch. 7, sec. 306b; Beale, II Conflict of Laws 971, sec. 249.4; 20 C.J.S. Corporations § 1868, E. Rights and Powers With Respect to Property, pp. 91–93; 11 Am.Jur. 478, Conflict of Laws, Wills, B. Capacity and Status, sec. 170. Under Massachusetts law, as we have shown, the Mother Church is a corporation, among other things, for the purpose of inheriting property and appearing in court in connection with this right of inheritance. The spirit of comity existing between the several states of our country requires that Louisiana recognize the corporate powers possessed by the Mother Church under Massachusetts law, unless by so doing we would violate the positive law or public policy of our own state. Saul v. His Creditors, 5 Mart.,N.S., 569; Succession of Petit, 49 La.Ann. 625, 21 So. 717; Brinson v. Brinson, 233 La. 417, 96 So.2d 653; 11 Am.Jur. 296–303, Conflict of Laws, B. Comity, secs. 4–6.

Numerous Louisiana cases illustrate the principle set out above. In Jones v. Hunter, 1843, 6 Rob. 235, the testator had made a will in Mississippi leaving his entire estate to his acknowledged natural child. At the time of his death he owned both real and personal property in Louisiana, and his half brothers brought suit here to obtain this property. This court pointed out that under the Louisiana Civil Code a disposition in favor of an acknowledged natural child could not exceed one-fourth of the testator's property if he left legitimate brothers or sisters, and one-third if he left more remote collateral relations,

and held that if the plaintiffs succeeded in showing that they were the legitimate brothers and sisters of the testator, the disposition in favor of the acknowledged natural child should be reduced to one-fourth and the balance of the property of the deceased should go to his legitimate relations.

In Scott v. Key, 1856, 11 La.Ann. 232, an infant was born out of wedlock to a resident of Arkansas and while still a resident of that state was legitimated by an act of the Arkansas legislature. Thereafter the father and son became residents of Louisiana. In a contest between the heirs of the father and the heirs of the legitimated son involving real property in Louisiana this court held that under Arkansas law the son was legitimate, and that when the father died in Louisiana, fourteen years after the statute had been passed, his legitimate son was his heir under Louisiana law. In the course of its opinion this court observed that the Arkansas statute in no way conflicted with the Louisiana law of inheritance under which the legitimate son inherits in preference to the brothers and sisters of the deceased.

In Succession of Petit, 1897, 49 La.Ann. 625, 21 So. 717, the deceased died in France, his domicile, and a struggle for his personal property ensued in the Louisiana courts between his brothers and sisters and his natural child, the latter having been duly acknowledged by the deceased

in France. This court observed that under the Napoleonic Code the natural child in France is placed on a footing of equality as respects the right of inheritance with the brothers and sisters of the deceased, whereas the Louisiana Code, on the contrary, excludes the natural child from any inheritable right to the succession of the father, unless his succession would otherwise go to the state, thus placing the natural child among the irregular heirs. In Petit we refused to allow the French child to inherit any of his father's property, saying:

"If in this case, then, we are to give effect to the French law, we disregard the spirit and text of the Code, as well as the public policy, the basis of our law on this subject. In thus deviating from our policy and legislation we deny the right of inheritance our Code confers on two of our citizens included among the collateral heirs of the deceased; we enforce to their prejudice a title utterly repugnant to our system, and derived solely from the foreign law, and the force given to it, as is claimed, by the comity due from one to another state. We are not aware of any case in which international comity has been thus applied."

In Succession of Meunier, 1899, 52 La. Ann. 79, 26 So. 776, 780, 48 L.R.A. 77, on the other hand, a case similar to the one at bar, we upheld a bequest by a Louisiana resident of all of his real and person-

al property in this state to the city of Carouge in Switzerland, because in so doing we did not violate either our positive law or our public policy. We are interested to note that in the Meunier case the collateral heirs of the testator attacked his legacy to the Swiss city because, among other things, "the city of Carouge is incapable of receiving the legacy, and one of the grounds advanced for this contention is that the treaty of 1850 between the United States and the Swiss Republic restricts the right of acquiring property in the territory of the other to *citizens,* and that this excludes the city of Carouge, which cannot be held included within the term 'citizens.' " [3] We rejected this construction as too narrow and held that the city of Carouge was capable of receiving the legacy, observing that legacies for pious uses are "not only not prohibited by the law, but viewed with favor."

In Succession of Herber, 1911, 128 La. 111, 54 So. 579, the testatrix died in Mississippi, where she had been residing, and left a will in which, among other dispositions, she directed that real estate belonging to her in New Orleans be rented during the life of her friend, Henry Lienhard of Mississippi, out of which rent Leinhard was to receive $75 per month during his life, the property to be sold after his

death; and that the residue of her estate was to go to the Rev. J. S. Moore. An heir at law of the testatrix attacked her will here on the grounds that the disposition of real estate was void as a substitution or fidei commissum, and that the disposition in favor of the minister was invalid because he had attended the testatrix during her last illness. We struck down the disposition of the property on the ground that it was obnoxious to the spirit and policy of our law, and we also threw out the residuary legacy to the minister—even though both he and the testatrix were residents of Mississippi where such dispositions are permitted—on the basis that it violated Article 1489 of the Louisiana Civil Code.

Recently, in Brinson v. Brinson, 1957, 233 La. 417, 96 So.2d 653, 660, we stated that it would be contrary to Articles 117 and 118 of our Civil Code and the public policy of this state to allow a bigamous marriage contracted in bad faith in another state to produce its civil effects in Louisiana, although "common law marriages valid and legal in the states where contracted will ordinarily be given recognition, as a matter of comity, by the courts of Louisiana."

Under the conflict of law principles set forth earlier in this opinion and used by

---

3. In the instant case appellants argue that under Article 1470 of our Code only *persons* can receive a legacy, and that this excludes the Mother Church, which cannot be included within the term "persons".

this court to decide the cases discussed above, we must now determine whether Mrs. Fisher's residuary legacy to the Mother Church violates our positive law or public policy. Appellants argue that it does because, in their own words "R.C.C. art. 1470 gives all 'persons' capacity to receive a legacy (excepting those the law declares incapable); R.C.C. art. 1473 contemplates that a legatee must be a person in existence at the testator's death; R.C.C. art. 427 defines a corporation to be an 'intellectual person' and points out that for some purposes a corporation is considered a natural person; and R.C.C. art. 433 expressly gives corporations capacity to receive a legacy, the same as natural persons; conversely, our law does not consider an unincorporated association to be a person, nor does it give an unincorporated association any capacity to receive a legacy." Appellants also rely on two decisions of this court in support of their position— Succession of Hardesty, 22 La.Ann. 332, and the recent case of Carr v. Hart, 220 La. 833, 57 So.2d 739.

■ There is no merit in appellants' contention. The articles of our Civil Code relied on do not even suggest that a religious society possessing limited corporate powers, among which is the right to inherit property, is incapable of receiving a legacy. Furthermore, the Hardesty and Carr cases, supra, do not stand for the broad proposition that every unincorpo-rated association is ipso facto incapable of inheriting property, as appellants would have us believe. These cases involved exceptional facts, easily distinguishable from the facts in the case at bar. In Hardesty, for example, the testatrix' heirs and universal legatees challenged a legacy to the Baptist Church of Clinton, La., claiming that at the time of the death of the testatrix there was no corporation bearing that name, or having any legal existence, which had the capacity to take. This court struck down the legacy on the ground that the Baptist Church of Clinton had no capacity to receive the legacy because it was not only not incorporated, but, unlike the Mother Church, apparently had no organization or legal powers of any kind, a number of individuals having simply associated themselves together under the name of the Baptist Church of Clinton. In Carr v. Hart, supra [220 La. 833, 57 So.2d 741], a collateral heir attacked a provision of her sister's will which left $2,500 "for cemetery fund to keep cemetery clean and repairs." This court held the bequest invalid because "there was not in existence at the date of the testatrix's death any person, political entity or body corporate charged with the administration of either fund or cemetery."

■ Not only does our positive law not prohibit such a legacy as the one under attack in the instant case, but our public policy favors donations to religious and

charitable institutions. Succession of Vance, 39 La.Ann. 371, 375, 2 So. 54; Succession of Meunier, supra. Accordingly, comity requires us to recognize the Mother Church's legal right to receive this legacy. Incidentally, that church, being authorized by the Massachusetts legislature to sue in Massachusetts in conjunction with its right to inherit property, must be accorded the right to appear in this suit in Louisiana in its own name. See Art. 446 of the Louisiana Civil Code.

We come now to the second ground on which Mrs. Fisher's residuary legacy to the Mother Church in Boston is being attacked by appellants—*i. e.*, that the bequest is prohibited by Article 1489 of the Louisiana Civil Code, which strikes with nullity a donation mortis causa made to a physician or minister who has professionally attended the donor during his or her last illness. This court has stated that the public policy of this state, as expressed in Article 1489, prohibits those who attend a sick person, or who wait on the sick professionally during their last illness, from benefiting by a donation inter vivos or mortis causa, because of the influence they can exert over the ill. Cormier v. Myers, 1953, 223 La. 259, 65 So.2d 345.

Appellants' reasoning on this second ground of attack is as follows:

"Decedent died of cancer, which sickness had its onset long prior to August 31, 1954, when she made her will, and which sickness prior to said date had advanced to the stage where it was inevitably fatal. * * *

"* * * * * * *

"The doctrines of Christian Science and the other established and admitted facts make it abundantly clear that during this sickness The Mother Church ministered to decedent in performance of the professional functions of both a doctor and a minister.

"The Mother Church, The First Church of Christ, Scientist, in Boston, Mass., is the fountainhead of Christian Science. It has 3000 branch churches throughout the world, including the First Church of Christ, Scientist, in New Orleans, and controls all of them. Its doctrines are all written and are contained in its literature and publications, consisting of the works of Mary Baker Eddy—Science and Health, The Church Manual, and Prose Works; its periodical publications include: The Christian Science Quarterly which includes a listing of those portions of Science and Health it designates for reading and study by Christian Scientists each week and for reading by them by readers at services in The Mother Church and in all of its branch churches; The Christian Science Sentinel, containing selected materials; and The Christian Science Journal containing selected materials and a listing of branch churches, practitioners, etc.; these publica-

tions are issued thru its Christian Science Publishing Society and are distributed to Christian Scientists by subscription or sale thru Reading Rooms maintained in connection with its branch churches.

"A Christian Scientist may be a member of one branch church and of The Mother Church.

"The Church is unique in that it has no clergymen either in the Mother Church or in any of its branches. It has readers both in The Mother Church and in each branch church who read from the literature, without comment, what is prescribed by The Mother Church for each service. Science and Health is designated as a pastor of The Mother Church and all of its branches, and it and the Bible are designated as 'our only preachers'.

"Having no clergymen, The Mother Church ministers directly to Christian Scientists thru their reading its literature or having it read to them at services in The Mother Church or in a branch church or by a practitioner and by their attendance at lectures by lecturers of The Mother Church. The decedent was the recipient of such ministrations by every one of these methods. * * *

"Appellees argue that Christian Science is purely a religion. It is true that The First Church of Christ, Scientist, of Boston,

Massachusetts has a religious title, but there the analogy to religion ends. It, of course, has its theological aspects, which makes it a religion, but in addition there is its application to health, the healing of disease, which makes it a medical system, as its own doctrines repeatedly attest. * * Christian Science supplants medical science and represents that it alone will heal all disease, even such as medical science would find to be incurable."

Briefly, appellants argue that because of the unusual organization and doctrines of the Christian Science religion, the Mother Church should be held to be incapable under Article 1489 of receiving a donation made to it by a member of the Christian Science religion during his or her last illness. Appellants' reasoning, though ingenious, does not impress us as sound. Article 1489 speaks only of "doctors of physic or surgeons" and "ministers of religious worship", and although the article has been interpreted by us to include all those who attend a sick person, or who wait on such a person professionally during his last illness, Cormier v. Myers, supra, it can by no stretch of the imagination be held to include a religious organization such as the First Church of Christ, Scientist, in Boston, Massachusetts.

The lower court judgment is affirmed, appellants to pay all costs of this appeal.