153 So.2d 470 (1963)
Succession of Elton ANDREWS.
No. 1042.
Court of Appeal of Louisiana, Fourth Circuit.
May 6, 1963.
Rehearing Denied June 4, 1963.
*471 Reed, Reed & Reed, Floyd J. Reed, New Orleans, for Martha C. Eames, appellant.
Pilie, Nelson & Limes, John P. Nelson, Jr., Robert J. Landry, Katherine S. Wright, New Orleans, of counsel for Parcell Andrews, appellee-opponent.
Before SAMUEL, CHASEZ and HALL, JJ.
HALL, Judge.
This is an action by a brother of decedent in which he seeks to annul decedent's last will and testament and particularly a residual legacy in favor of Martha C. Eames, a registered nurse who regularly attended testator for several years immediately preceding his death. From a judgment decreeing the nullity of the will, Martha C. Eames appealed.
Decedent died on October 6, 1961 as a result of carcinoma of the prostate with metastasis. He left no forced heirs nor surviving spouse, his nearest heirs at law being two brothers, one of whom is the opponent here, and two nieces and a nephew, children of a predeceased sister. He left a will in the nuncupative form by public act dated May 24, 1961 in which, after making certain small cash bequests to his nephew and nieces, he bequeathed the balance of his estate to Martha C. Eames "who nursed me for five years and who looked after my affairs and who also nursed my deceased wife". Martha C. Eames was also appointed executrix.
The brother's opposition to the registry and execution of the will was based on three grounds viz.:
1) That the testator was not of sound body or mind at the time the will was confected,
2) That Martha C. Eames, because of the testator's feeble condition, was able to and did exert undue influence over testator in her favor while acting as his nurse, and
3) That Martha C. Eames, a registered nurse who attended him during his last illness is by reason of the prohibition contained in LSA-C.C. art. 1489 incapable of receiving any donations made in her favor.
In his "Reasons for Judgment" the trial judge said in part:
"The deposition of Dr. Guy T. Williams, the attending physician, refutes the idea of an unsound mind. Of course the testator was of an unsound body at the time he made the will. However, we are of the opinion that the influence exerted on the testator by Martha C. Eames was sufficient to invalidate the will."
The record discloses that the testator's wife predeceased him on July 3, 1957 after a long illness. Before her death, Martha C. Eames, a registered nurse, came to live in the testator's residence to take care of his wife in her illness. After his wife died, Martha continued to reside at the testator's home until his death. During that time she followed her nursing career on a regular basis at Charity Hospital. She also took care of the testator's needs at home. She prepared his special diet, fed him, gave him his medicine, cleaned the house and accompanied him to the doctor on occasion.
During a period of approximately eleven months the testator made three nuncupative wills by public act. The first, dated June 20, 1960 gave $3,500.00 to the testator's nephew and nieces, with $3,000.00 going to Martha C. Eames. The second will dated December 15, 1960 gave $3,500.00 to the nephew and nieces but in different proportions from the first testament, with $3,000.00 *472 in cash plus a piece of real estate later valued at $15,000.00 going to Martha C. Eames. The third will, which is under attack in these proceedings, gave a total of $700.00 to the nephew and nieces, with the balance of the estate, now valued at approximately $32,000.00, going to Martha C. Eames as residuary legatee. Martha C. Eames was appointed executrix under each will.
Testimony adduced on behalf of the opponent was to the effect that testator was weak from disease and feeble from age (his age at the time of his death was variously stated as 78 or 84); that at times the testator would become confused and lose track of the time of day; that at times he would not recognize certain visitors, and would stare with a blank expression when he was addressed; that at other times when someone engaged him in conversation he would start talking about some other subject; that he "was real off his rocker" had lost his memory and "couldn't understand nothing". Opponent also introduced testimony to show the influence exerted upon testator by the nurse, Martha C. Eames. Opponent's witnesses testified that testator gradually became subjected to her dominance and control and was brow-beaten or persuaded by her to leave more and more to her at the expense of his collaterals, as evidenced by the provisions of the three wills. These witnesses testified to overhearing frequent arguments between Martha and the testator wherein she took him to task because he had given her only his wife's jewelry as payment for her services and that this was not a sufficient reward for her loyalty. There was also testimony to the effect that testator frequently complained to his nieces that Martha was asking for too much money and also that she prohibited him from giving small presents to his nieces which he had formerly been in the habit of giving.
The testimony relative to Martha Eames' influence over the testator was admissable under the holding in Cormier v. Myers, 223 La. 259, 65 So.2d 345, not for the purpose of invalidating the will because of undue influence for that would contravene the provisions of LSA-C.C. art. 1492, but for the purpose of showing mental weakness in the testator. The Cormier case held:
"While our law (Article 1492, [LSA-]C.C.) does not recognize duress, force or undue influence unless they are present at the making of the will, yet such incidents are evidence of the testamentary incapacity and mental weakness of the testatrix."
See also Succession of Franz, 232 La. 310, 94 So.2d 270.
As against the testimony adduced by opponent we have the testimony of Dr. W. A. Reed and Dr. Guy T. Williams, testator's treating physicians; also the testimony of one of the witnesses to the will; of the notary to whom the will was dictated; and of a long time friend and former business partner of the deceased.
Dr. Reed, an urologist, treated the deceased over a long period of time. The last occasion on which he saw him was on May 3, 1961. He testified that during the time he treated him and through May 3, 1961 "he always seemed to be mentally clear to me", and that he saw nothing in his condition to lead him to believe testator was mentally incompetent.
Dr. Williams, an internist, treated the testator from November 29, 1960 on referral from Dr. Reed until his death on October 6, 1961. During this time he had the testator hospitalized under his care and observation on three different occasions to wit: from November 29, 1960 to December 7, 1960; from January 12, 1961 to January 18, 1961 and from August 9, 1961 to August 13, 1961. He also saw testator in his office on fourteen other different occasions and had ample opportunity to observe him. One of those occasions was on May 3, 1961, approximately 21 days before the will was written and another occasion was on June 1, 1961, one week after the confection of the *473 will. The last time testator visited Dr. Williams at his office was on October 3, 1961, three days before he died. Dr. Williams testified that testator was mentally clear at all times, that he was physically weak but was "always oriented and he did not behave peculiarly in my presence at any time; answered my questions lucidly * * *".
One of the witnesses to the will and the notary testified at length as to the circumstances surrounding the taking of the will and as to the testator's competency at the time the will was signed. We see no necessity to detail their testimony beyond stating that the will was written in a room at testator's residence and that before dictating it the testator ordered Martha Eames to leave the room. We also see no necessity of reviewing the testimony of testator's former business partner. Suffice it to say all of them testified that the testator was mentally sound and alert and gave no indication of senility or mental weakness.
We have carefully scrutinized all of the evidence relative to the testator's testamentary capacity, including the testimony relative to the influence exercised over the testator by Martha C. Eames insofar as such testimony might have a bearing on his mental competence. In our opinion the testimony as a whole leaves no doubt that the testator was of sound and disposing mind before, after, and at the time of making the will.
The trial judge found that the testimony of Dr. Williams "refutes the idea of an unsound mind", but then went on to say that "the influence exerted on the testator by Martha C. Eames was sufficient to invalidate the will". We do not think by this remark that the trial judge meant to imply that evidence of duress or undue influence not present at the making of the will would serve to invalidate the dispositions thereof because such a holding would be directly contrary to the prohibition contained in LSA-C.C. Art. 1492 which reads:
"Art. 1492. Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation."
Rather, we think that the trial judge's mind was focused on the fact that Martha C. Eames was a registered nurse and that he was influenced in his holding by certain expressions found in Cormier v. Myers supra. We are prompted to this belief because at the outset of the trial below opponent's counsel announced that "the general principal upon which we base this case is found in Cormier v. Myers [223 La. 259], 65 So.2d 345", and counsel adhered to his theory throughout the trial, and argued it vigorously on appeal.
Opponent's theory and contention is that Martha C. Eames, as a registered nurse, falls within the spirit of the prohibition contained in Civil Code Article 1489 (LSA-C.C. art. 1489) and is precluded as a matter of public policy from taking a donation from the testator whom she nursed during his last illness.
Article 1489 provides in part as follows:
"Doctors of physic or surgeons, who have professionally attended a person during the sickness of which he dies, can not receive any benefit from donations inter vivos or mortis causa made in their favor by the sick person during that sickness * * *."
Opponent relies on, and we believe that the trial judge was influenced by, the following passage from the case of Cormier v. Myers, supra:
"The public policy of this State, as expressed in Article 1489 [LSA-]C.C., prohibits those who attend a sick person, or who wait on them professionally during their last illness, from benefiting by a donation inter vivos, or mortis causa, because of the influence they can exert over the ill. While the keeper of a boarding house for the aged and infirm is not included in this category *474 by letter, the spirit is there. To establish the validity of a will made under the circumstances as described here would be establishing a dangerous precedent, and might encourage others charged with the care of the aged and infirm to prey upon their senility. A court must look upon such cases with grave suspicion, and must scrutinize the evidence and the circumstances with extreme care, to the end that the weak and incapable shall not be bent to the will of the greedy and the artful."
See also Succession of Vicknair, La.App., 126 So.2d 680 and Succession of Fisher, 235 La. 263, 103 So.2d 276, which reiterate the same proposition.
However the issue for decision in this case was squarely disposed of in Succession of Willis, La.App., 149 So.2d 218, decided by the Second Circuit since trial of this case below and while it was pending on appeal. That case held that a registered nurse does not come within the phrase "doctors of physic or surgeons" and therefore is not prevented by the article 1489 from receiving donations from a person nursed by her during his last illness. Judge Bolin, as organ of the Court, disposed of the public policy argument of the Cormier case as follows:
"The gratuitous statements in the Cormier case, cited above, were repeated in the Fisher and Vicknair cases. As such remarks relate to LSA-C.C. Art. 1489 we interpret them to be dicta. Indeed we are unable to see how we could construe them otherwise. As we appreciate the term `public policy', it should only be used as an aid in interpretation of statutes or in cases where the intent or language is not clear or where the subject matter is not covered by positive law. To say that `public policy' could be utilized to add to or take away from an unambiguous codal article would be using it as a weapon for the courts to completely destroy the power of the legislative branch of our government by judicial legislation. As the vocation of nursing has been practiced since the early days of Christianity, the redactors of our civil code obviously did not intend to include nurses under Article 1489. Whether the lawmakers should have also listed nurses because they are in a position to exert the same influence over the ill as doctors is not a judicial question."
Moreover the Supreme Court removed all doubt from the question when it refused writs in the Willis case. In its per curiam the Supreme Court said:
"Writ refused. On the facts found by the Court of Appeal there is no error of law in its judgment. The assertion of the Court of Appeal that statements made in Cormier v. Myers, 223 La. 259, 65 So.2d 345; Succession of Vicknair, La.App., 126 So.2d 680, and Succession of Fisher, 235 La. 263, 103 So.2d 276 are dicta, is correct." 244 La. 132, 150 So.2d 589. Writs denied March 15, 1963.
The reason behind the prohibition contained in Article 1489 is because of the influence doctors, surgeons, and ministers of religious worship can exert over the ill. The article is in effect an exception to the rule prescribed by Article 1492, and as an exception to the general rule it should be strictly construed. Since Article 1489 does not include nurses eo nomine in its terms it does not bar them from receiving donations made by the sick in their favor.
"All persons may dispose or receive by donations inter vivos or mortis causa, except such as the law expressly declares incapable." LSA-C.C. 1470 (Emphasis supplied).
As held in Cormier v. Myers, supra, evidence of duress, force or undue influence is admissible for the purpose of showing testamentary incapacity and mental weakness, but that in our opinion is the sole purpose for which it may be considered, and a *475 will may not be invalidated for duress, force or undue influence, not present at the making of a will, even if exercised by a registered nurse who attends the testator during his last illness.
For the foregoing reasons the judgment appealed from is reversed, the opposition of Parcell Andrews to the probate registry and execution of the will is dismissed, and the succession proceedings are remanded to the district court for further proceedings according to law not inconsistent herewith, costs of both courts in the present proceeding to be borne by opponent.
Reversed and remanded.