251 So.2d 465 (1971)
Succession of Elnora Duncan BROWN.
No. 8467.
Court of Appeal of Louisiana, First Circuit.
June 30, 1971.
Rehearing Denied September 2, 1971.
*466 Walton J. Barnes, Baton Rouge, for appellant.
William Brown of Howell & Brown, Allen Bergeron, Jr., Baton Rouge, for appellee.
Before LANDRY, ELLIS and BLANCHE, JJ.
LANDRY, Judge.
Willie Mae Brown Moore (Claimant), granddaughter of decedent, Elnora Duncan Brown, appeals the judgment of the trial court rejecting her claim that a will made by decedent in 1963, which revoked a former will naming Claimant as legatee, is void for lack of testamentary capacity. Appellant also complains of the trial court's dismissal of her alternative demands for payment for personal services rendered decedent, and the return of certain funds allegedly belonging to Claimant, and held by decedent in trust. We affirm that portion of the judgment which rejected appellant's attack on the second will. We amend that part of the judgment which ordered dismissal of appellant's reconventional demands.
The following pertinent facts are conceded: Decedent's sole heirs at law are her three surviving children, Virginia Brown Matthews, Leon Brown, Jr., and Eula Brown Reynolds, all issue of decedent's marriage to her predeceased husband, Leon Brown, Sr. Claimant is the illegitimate daughter of decedent's predeceased son, Willie Brown. Decedent died January 18, 1968, leaving two wills, namely, a valid nuncupative will under private signature, dated February 21, 1959, naming Claimant and decedent's children as decedent's heirs, and a contested nuncupative will by public act executed September 10, 1963, which revoked decedent's former will, and left decedent's entire estate to her three children. Decedent was 81 years old at her death. Decedent was not insane. On August 23, 1963, decedent suffered a severe cerebral hemorrhage. She was hospitalized in a psychotic state and suffering from hemiplegia. The contested will was executed 18 days following decedent's hospitalization, and after she had returned home in an improved condition. The 1959 will was probated September 12, 1968, upon application of Claimant. Subsequently, on March 6, 1969, decedent's three children filed a petition in the succession proceedings to set aside the probate of the 1959 will, and obtain recognition of the 1963 testament as decedent's last will. On April 15, 1969, Claimant opposed the probate of the latter testament *467 on the ground that decedent lacked the requisite testamentary capacity on the date the latter will was executed. Alternatively, Claimant sought recovery of $13,436.00 for services rendered decedent during the last four years of decedent's life pursuant to an alleged oral agreement. Claimant also sought recovery of the sum of $4,006.15 paid Claimant as beneficiary of an insurance policy on the life of Claimant's uncle, James R. Brown, and which amount was allegedly held by decedent because of Claimant's minority. The trial court denied Claimant's attempt to establish her alternative claims by parol testimony on the ground that LSA-R.S. 13:3721 prohibits receipt of such testimony to prove a debt or liability of a deceased person against his estate or heirs unless suit is brought on the claim prior to or within one year of decedent's death.
Testamentary capacity is solely a question of fact which is determined in accordance with certain well established principles of law. Succession of Herson, La. App., 127 So.2d 61.
As defined by the laws and jurisprudence of this state, testamentary capacity means possession of one's mental faculties to the extent that the testator has full knowledge and understanding of the import and effect of his action. The testator must be legally sane or experience a lucid interval throughout the period required to confect the testament. Succession of Herson, above.
Testamentary capacity is always presumed and the burden is upon the party attacking the will to prove that at the time the will was drawn, the testator was not sufficiently sound of mind to fully understand the nature of the testamentary act and appreciate its effects. Artigue v. Artigue, 210 La. 208, 26 So.2d 699.
The test in determining testamentary capacity is whether such capacity existed at the moment the will was made. Cormeier v. Myers, 223 La. 259, 65 So.2d 345.
The degree of proof required to overcome the presumption of testamentary capacity is similar to that required in criminal cases to remove the presumption of innocence, namely, any reasonable doubt must be resolved in favor of the validity of the will. Succession of Lambert, 185 La. 416, 169 So. 453.
Testamentary capacity is a question of fact and more specifically the presence of such requisite condition at the precise time of making the will, the issue being one which must be determined in the light of the circumstances obtaining in each individual case. In deciding testamentary capacity, the courts will consider the physical and mental condition of the testator not only at the time of making the will, but also prior and subsequent thereto, since the actions, conduct and physical and mental condition of the testator before and after, as well as at the time of making the will, are of probative value in determining testamentary capacity. Succession of Herson, above.
Dr. Jacob Faust, a specialist in internal medicine, was decedent's treating physician from April 28, 1963, until decedent's death in January, 1968. Dr. Faust stated that in April, 1963, he hospitalized decedent for a recent stroke and high blood pressure. He also attended decedent during a period of hospitalization from August 23, to August 28, 1963, when decedent was suffering from multiple cerebral thromboses and early uremia, and was admitted in a psychotic state. In August, 1963, plaintiff responded fairly well to treatment. He found that plaintiff was oversedated for the first few days. Decedent's blood pressure was controlled, and she was discharged to continued nursing care at home. Dr. Faust found decedent's general condition poor. He noted she was bedridden throughout the entire period of his treatment, and that she was essentially helpless *468 and required continued care. He considered that decedent's mental functioning was poor from 1963 until her death, but that her mental state was better in 1963 than in the latter years prior to her death. He also noted that her condition steadily declined. Dr. Faust further testified that in 1963, decedent could speak and recognize people, and that she knew and was aware of what was going on around her, but not to the extent that a normal person could because decedent was functioning with a damaged brain. As Dr. Faust put it, decedent "had bad days and not so bad days, but no good days." He acknowledged that decedent showed some improvement following her discharge from the hospital in August, 1963. Dr. Faust's opinion of decedent's mental state on September 10, 1963, is summed up in his statement as follows: "Well, she could recognize people, and she could talk a little, but as far as being able to understand well and reason to the extent that a well person would be able to, she could not." A fair analysis of Dr. Faust's testimony as a whole is that he considered that decedent did not possess testamentary capacity.
The contested will was witnessed by (1) James White, acquaintance who knew decedent about 20 years; (2) Leora Huggins, cousin of decedent, who was acquainted with decedent for 25 years; (3) Lenora M. Williams, daughter of Virginia Brown Matthews (legatee in the second will), and granddaughter of decedent, who was well acquainted with decedent; (4) Joe Smith an acquaintance of 18 years, and (5) Leonard Matthews, husband of Virginia Brown and son-in-law of decedent. In essence, each witness testified to visiting decedent often, if not daily, for a long period prior to decedent's demise. Each stated in effect that although decedent was physically weak and helpless, nevertheless, her mind was clear. They also stated that whereas decedent had "good days" and "bad days", she always knew them when they called, and understood what was going on about her. Each further deposed that on September 10, 1963, decedent was mentally alert, recognized everyone present, and freely told them and the notary that she wished to leave all her property to her children. They all testified that decedent was fully aware of and understood what she was doing.
Eula Brown Reynolds, decedent's daughter, testified that in July, 1963, she flew from her home in Chicago, Illinois, to assist in her mother's care. She remained until late September. She acknowledged that at times decedent was not very alert, but on September 10, 1963, decedent had full possession of her mental faculties and fully understood what she was doing.
The contested will was received by William H. Brown, attorney-at-law and Notary Public. In substance, he stated that he was called to decedent's home and introduced to decedent. He responded in the affirmative to decedent's inquiry as to whether he was a lawyer. Decedent affirmatively replied to his inquiry that he, Notary Public, understood decedent wished to make her will. He then began talking with decedent to determine her alertness because she had obviously been very ill. He noted that he "kidded" with decedent by holding up nine fingers and asking her how many, and also that she laughingly replied "Nine." Brown then asked decedent if she wanted to make a will, and what she wanted to have happen to her property when she died, and she replied she wanted it to go to her three children. Brown testified unequivocally that he satisfied himself that decedent knew what she was doing, otherwise he would not have proceeded to received the will.
We consider it most significant that the testimony of the foregoing lay witnesses was corroborated to some extent by that of Claimant, Willie Mae Brown Moore, who would benefit if the contested will *469 were found invalid. Mrs. Moore acknowledged that she had been reared by decedent. She, her husband and her four children lived for years in an apartment furnished by decedent and located on decedent's premises. During decedent's declining years, Mrs. Moore cared for decedent continually except for a period of three or four weeks following decedent's return from the hospital in 1963. She explained that she moved out at this time because her children disturbed decedent, but later returned at the request of Mrs. Reynolds. In substance, Mrs. Moore testified that decedent was mentally confused at times following her first stroke in 1963. She acknowledged that whereas decedent's speech was slurred, decedent could be understood. She also stated that when decedent returned from the hospital in August, 1963, decedent was conscious of what was going on about her. She did not testify that decedent was mentally incompetent to make a will on September 10, 1963.
The record before us is devoid of testimony in support of the charge that the contested will was the product of coercion, threats, intimidation, misrepresentation, fraud or deceit. Conversely, the record indicates the total absence of all such circumstances.
We conclude that although decedent has been shown to have been gravely ill and suffering from numerous serious disorders, nevertheless, she possessed testamentary capacity on September 10, 1963.
Claimant's alternative claims are in reality reconventional demands, though not so labeled in her pleadings. For purposes of this discussion, we shall consider them as reconventional demands.
The claim for reimbursement for nursing services rendered decedent is based on the doctrine of unjust enrichment. It is also predicated on an alleged verbal agreement pursuant to which decedent agreed to pay claimant. The claim for funds allegedly given to decedent in trust is also founded on verbal testimony.
LSA-R.S. 13:3721 reads as follows:
"Parol evidence shall not be received to prove any debt or liability of a deceased person against his succession representative, heirs, or legatees when no suit to enforce it has been brought against the deceased prior to his death, unless within one year of the death of the deceased:
(1) A suit to enforce the debt or liability is brought against the succession representative, heirs, or legatees of the deceased;
(2) The debt or liability is acknowledged by the succession representative as provided in Article 3242 of the Code of Civil Procedure, or by his placing it on a tableau of distribution, or petitioning for authority to pay it;
(3) The claimant has opposed a petition for authority to pay debts, or a tableau of distribution, filed by the succession representative, on the ground that it did not include the debt or liability in question; or
(4) The claimant has submitted to the succession representative a formal proof of his claim against the succession, as provided in Article 3245 of the Code of Civil Procedure.
The provisions of this section cannot be waived impliedly through the failure of a litigant to object to the admission of evidence which is inadmissible thereunder."
The applicable statute is not prescriptive because the running of prescription prevents proof of an obligation in any *470 manner; the statute in question prevents the use of parol evidence only when suit is filed more than one year after decedent's death. Vordenbaumen v. Gray, La. App., 189 So. 342. Appellant contends the statute is inapplicable herein because she instituted proceedings to probate the first will within one year of decedent's death, and her demand for reimbursement forms part of that action. The argument is without merit. The initial proceeding by appellant sought only to have the 1959 will probated, and the persons named therein as legatees recognized as such and placed in possession of decedent's estate. It did not have for its purpose recognition and enforcement of a debt of decedent against the heirs and succession representatives. A suit to enforce a debt is not "brought" until a pleading making such a demand is filed on behalf of the alleged obligee. In this instance, suit was "brought" when appellant filed her reconventional demand making claims for reimbursement. This pleading was filed April 15, 1969. Decedent died January 18, 1968, more than one year previously. Under the circumstances, the trial court properly rejected parol evidence to establish appellant's alternative demands.
Since the controlling statute is not prescriptive, the trial court should not have dismissed appellant's alternative claims. Collier v. Administrator, Succession of Blevins, La.App., 136 So.2d 774. Accordingly, that portion of the judgment of the lower court dismissing appellant's alternative reconventional demands must be amended.
It is ordered, adjudged and decreed that the judgment of the trial court is reversed insofar as it dismisses appellant's alternative demands in reconvention, and that, in all other respects, the judgment is affirmed at appellant's cost.
Amended and affirmed.